## YICK WO v. HOPKINS, SHERIFF.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

## WO LEE v. HOPKINS, SHERIFF.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF CALIFORNIA.

Submitted April 14, 1886.—Decided May 10, 1886.

In a suit brought to this court from a State court which involves the constitutionality of ordinances made by a municipal corporation in the State, this court will, when necessary, put its own independent construction upon the ordinances.

A municipal ordinance to regulate the carrying on of public laundries within the limits of the municipality violates the provisions of the Constitution of the United States, if it confers upon the municipal authorities arbitrary power, at their own will, and without regard to discretion in the legal sense of the term, to give or withhold consent as to persons or places, without regard to the competency of the persons applying, or the propriety of the place selected, for the carrying on of the business.

An administration of a municipal ordinance for the carrying on of a lawful business within the corporate limits violates the provisions of the Constitution of the United States, if it makes arbitrary and unjust discriminations, founded on differences of race, between persons otherwise in similar circumstances.

The guarantees of protection contained in the Fourteenth Amendment to the Constitution extend to all persons within the territorial jurisdiction of the United States, without regard to differences of race, of color, or of nationality.

Those subjects of the Emperor of China who have the right to temporarily or permanently reside within the United States, are entitled to enjoy the protection guaranteed by the Constitution and afforded by the laws.

These two cases were argued as one and depended upon precisely the same state of facts; the first coming here upon a writ of error to the Supreme Court of the State of California, the second on appeal from the Circuit Court of the United States for that district.

The plaintiff in error, Yick Wo, on August 24, 1885, petitioned the Supreme Court of California for a writ of *habeas corpus*, alleging that he was illegally deprived of his personal

liberty by the defendant as sheriff of the city and county of San Francisco.

The sheriff made return to the writ that he held the petitioner in custody by virtue of a sentence of the Police Judges Court, No. 2, of the city and county of San Francisco, whereby he was found guilty of a violation of certain ordinances of the board of supervisors of that county, and adjudged to pay a fine of $10, and, in default of payment, be imprisoned in the county jail at the rate of one day for each dollar of fine until said fine should be satisfied, and a commitment in consequence of non-payment of said fine.

The ordinances for the violation of which he had been found guilty were set out as follows:

Order No. 1569, passed May 26, 1880, prescribing the kind of buildings in which laundries may be located.

" The people of the city and county of San Francisco do ordain as follows:

" SEC. 1. It shall be unlawful, from and after the passage of this order, for any person or persons to establish, maintain, or carry on a laundry within the corporate limits of the city and county of San Francisco without having first obtained the consent of the board of supervisors, except the same be located in a building constructed either of brick or stone.

" SEC. 2. It shall be unlawful for any person to erect, build, or maintain, or cause to be erected, built, or maintained, over or upon the roof of any building now erected or which may hereafter be erected within the limits of said city and county, any scaffolding, without first obtaining the written permission of the board of supervisors, which permit shall state fully for what purpose said scaffolding is to be erected and used, and such scaffolding shall not be used for any other purpose than that designated in such permit.

" SEC. 3. Any person who shall violate any of the provisions of this order shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than one thousand dollars, or by imprisonment in the county jail not more than six months, or by both such fine and imprisonment."

Order No. 1587, passed July 28, 1880, the following section:
" SEC. 68. It shall be unlawful, from and after the passage
of this order, for any person or persons to establish, maintain,
or carry on a laundry within the corporate limits of the city
and county of San Francisco without having first obtained the
consent of the board of supervisors, except the same be located
in a building constructed either of brick or stone."

The following facts were also admitted on the record: That
petitioner is a native of China and came to California in 1861,
and is still a subject of the Emperor of China; that he has
been engaged in the laundry business in the same premises and
building for twenty-two years last past; that he had a license
from the board of fire wardens, dated March 3, 1884, from
which it appeared "that the above described premises have
been inspected by the board of fire wardens, and upon such
inspection said board found all proper arrangements for carry-
ing on the business; that the stoves, washing and drying
apparatus, and the appliances for heating smoothing irons are
in good condition, and that their use is not dangerous to the
surrounding property from fire, and that all proper precautions
have been taken to comply with the provisions of order No.
1617, defining 'the fire limits of the city and county of San Fran-
cisco and making regulations concerning the erection and use
of buildings in said city and county,' and of order No. 1670,
'prohibiting the kindling, maintenance, and use of open fires
in houses;' that he had a certificate from the health officer
that the same premises had been inspected by him, and that he
found that they were properly and sufficiently drained, and
that all proper arrangements for carrying on the business of a
laundry, without injury to the sanitary condition of the neigh-
borhood, had been complied with; that the city license of the
petitioner was in force and expired October 1st, 1885; and
that the petitioner applied to the board of supervisors, June
1st, 1885, for consent of said board to maintain and carry on
his laundry, but that said board, on July 1st, 1885, refused
said consent." It is also admitted to be true, as alleged in the
petition, that, on February 24, 1880, " there were about 320
laundries in the city and county of San Francisco, of which

about 240 were owned and conducted by subjects of China, and of the whole number, viz., 320, about 310 were constructed of wood, the same material that constitutes nine-tenths of the houses in the city of San Francisco. The capital thus invested by the subjects of China was not less than two hundred thousand dollars, and they paid annually for rent, license, taxes, gas, and water about one hundred and eighty thousand dollars."

It was alleged in the petition, that "your petitioner and more than one hundred and fifty of his countrymen have been arrested upon the charge of carrying on business without having such special consent, while those who are not subjects of China, and who are conducting eighty odd laundries under similar conditions, are left unmolested and free to enjoy the enhanced trade and profits arising from this hurtful and unfair discrimination. The business of your petitioner, and of those of his countrymen similarly situated, is greatly impaired, and in many cases practically ruined by this system of oppression to one kind of men and favoritism to all others."

The statement therein contained as to the arrest, &c., was admitted to be true, with the qualification only, that the eighty odd laundries referred to are in wooden buildings without scaffolds on the roofs.

It was also admitted "that petitioner and 200 of his countrymen similarly situated petitioned the board of supervisors for permission to continue their business in the various houses which they had been occupying and using for laundries for more than twenty years, and such petitions were denied, and all the petitions of those who were not Chinese, with one exception of Mrs. Mary Meagles, were granted."

By section 2 of article XI of the Constitution of California it is provided that "any county, city, town, or township may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws."

By section 74 of the Act of April 19, 1856, usually known as the consolidation act, the board of supervisors is empowered, among other things, "to provide by regulation for the prevention and summary removal of nuisances to public health, the

prevention of contagious diseases ; . . . to prohibit the
erection of wooden buildings within any fixed limits where the
streets shall have been established and graded ; . . . to
regulate the sale, storage, and use of gunpowder or other ex-
plosive or combustible materials and substances, and make all
needful regulations for protection against fire ; to make such
regulations concerning the erection and use of buildings as
may be necessary for the safety of the inhabitants."

The Supreme Court of California, in the opinion pronouncing
the judgment in this case, said : "The board of supervisors,
under the several statutes conferring authority upon them, has
the power to prohibit or regulate all occupations which are
against good morals, contrary to public order and decency, or
dangerous to the public safety. Clothes washing is certainly
not opposed to good morals or subversive of public order or
decency, but when conducted in given localities it may be
highly dangerous to the public safety. Of this fact the super-
visors are made the judges, and, having taken action in the
premises, we do not find that they have prohibited the estab-
lishment of laundries, but that they have, as they well might
do, regulated the places at which they should be established,
the character of the buildings in which they are to be main-
tained, etc. The process of washing is not prohibited by thus
regulating the places at which and the surroundings by which
it must be exercised. The order No. 1569 and section 68 of
order No. 1587 are not in contravention of common right or
unjust, unequal, partial, or oppressive, in such sense as author-
izes us in this proceeding to pronounce them invalid."

. After answering the position taken in behalf of the petitioner,
that the ordinances in question had been repealed, the court
added : "We have not deemed it necessary to discuss the ques-
tion in the light of supposed infringement of petitioner's rights
under the Constitution of the United States, for the reason that
we think the principles upon which contention on that head
can be based have in effect been set at rest by the cases of
*Barbier* v. *Connolly*, 113 U. S. 27, and *Soon Hing* v. *Crowley*,
113 U. S. 703." The writ was accordingly discharged and the
prisoner remanded.

In the other case the appellant, Wo Lee, petitioned for his discharge from an alleged illegal imprisonment, upon a state of facts shown upon the record, precisely similar to that in the case of Yick Wo. In disposing of the application, the learned Circuit Judge, Sawyer, in his opinion, 26 Fed. Rep. 471, after quoting the ordinance in question, proceeded at length as follows:

" Thus, in a territory some ten miles wide by fifteen or more miles long, much of it still occupied as mere farming and pasturage lands, and much of it unoccupied sand banks, in many places without a building within a quarter or half a mile of each other, including the isolated and almost wholly unoccupied Goat Island, the right to carry on this, when properly guarded, harmless and necessary occupation, in a wooden building, is not made to depend upon any prescribed conditions giving a right to anybody complying with them, but upon the consent or arbitrary will of the board of supervisors. In three-fourths of the territory covered by the ordinance there is no more need of prohibiting or regulating laundries than if they were located in any portion of the farming regions of the State. Hitherto the regulation of laundries has been limited to the thickly settled portions of the city. Why this unnecessary extension of the limits affected, if not designed to prevent the establishment of laundries, after a compulsory removal from their present locations, within practicable reach of the customers or their proprietors? And the uncontradicted petition shows that all Chinese applications are, in fact, denied, and those of Caucasians granted—thus, in fact, making the discriminations, in the administration of the ordinance, which its terms permit. The fact that the right to give consent is reserved in the ordinance shows that carrying on the laundry business in wooden buildings is not deemed of itself necessarily dangerous. It must be apparent to every well-informed mind that a fire, properly guarded, for laundry purposes, in a wooden building, is just as necessary, and no more dangerous, than a fire for cooking purposes or for warming a house. If the ordinance under consideration is valid, then the board of supervisors can pass a valid ordinance preventing the maintenance, in a wooden

building, of a cooking stove, heating apparatus, or a restaurant, within the boundaries of the city and county of San Francisco, without the consent of that body, arbitrarily given or withheld, as their prejudices or other motives may dictate. If it is competent for the board of supervisors to pass a valid ordinance prohibiting the inhabitants of San Francisco from following any ordinary, proper, and necessary calling within the limits of the city and county, except at its arbitrary and unregulated discretion and special consent, and it can do so if this ordinance is valid, then it seems to us that there has been a wide departure from the principles that have heretofore been supposed to guard and protect the rights, property, and liberties of the American people. And if, by an ordinance, general in its terms and form, like the one in question, by reserving an arbitrary discretion in the enacting body to grant or deny permission to engage in a proper and necessary calling, a discrimination against any class can be made in its execution, thereby evading and, in effect, nullifying the provisions of the National Constitution, then the insertion of provisions to guard the rights of every class and person in that instrument was a vain and futile act. The effect of the execution of this ordinance in the manner indicated in the record would seem to be necessarily to close up the many Chinese laundries now existing, or compel their owners to pull down their present buildings and reconstruct of brick or stone, or to drive them outside the city and county of San Francisco, to the adjoining counties, beyond the convenient reach of customers, either of which results would be little short of absolute confiscation of the large amount of property shown to be now, and to have been for a long time, invested in these occupations. If this would not be depriving such parties of their property without due process of law, it would be difficult to say what would effect that prohibited result. The necessary tendency, if not the specific purpose, of this ordinance, and of enforcing it in the manner indicated in the record, is to drive out of business all the numerous small laundries, especially those owned by Chinese, and give a monopoly of the business to the large institutions established and carried on by means of large associated Caucasian capital. If the facts appearing on the face

of the ordinance, on the petition and return, and admitted in the case, and shown by the notorious public and municipal history of the times, indicate a purpose to drive out the Chinese laundry-men, and not merely to regulate the business for the public safety, does it not disclose a case of violation of the provisions of the Fourteenth Amendment to the National Constitution, and of the treaty between the United States and China, in more than one particular?　.　.　.　If this means prohibition of the occupa-tion, and destruction of the business and property of the Chi-nese laundrymen in San Francisco—and it seems to us this must be the effect of executing the ordinance—and not merely the proper regulation of the business, then there is discrimination and a violation of other highly important rights secured by the Fourteenth Amendment and the treaty.　That it does mean prohibition, as to the Chinese, it seems to us must be apparent to every citizen of San Francisco who has been here long enough to be familiar with the cause of an active and aggres-sive branch of public opinion and of public notorious events. Can a court be blind to what must be necessarily known to every intelligent person in the State?　See *Ah Kow* v. *Nunan*, 5 Sawyer, 552, 560; *Sparrow* v. *Strong*, 3 Wall, 97, 104; *Brown* v. *Piper*, 91 U. S. 37, 42."

But, in deference to the decision of the Supreme Court of California in the case of Yick Wo, and contrary to his own opinion as thus expressed, the circuit judge discharged the writ and remanded the prisoner.

*Mr. Hall McAllister, Mr. L. H. Van Schaick,* and *Mr. D. L. Smoot* for plaintiffs in error.

*Mr. Alfred Clarke* and *Mr. H. G. Sieberst* for defendant in error.

We claim that the city has power to adopt the section we are examining under article XI, section 11 of the Constitution "to make and enforce all such local police, sanitary and other regulations as are not in conflict with general laws." The po-lice power of the State does extend to the regulation of this business by excluding it from certain limits, as shown by *In re*

*McClain*, 61 Cal. 436; *In re Chin Yan*, 60 Cal. 78; *In re Ah Sing*, 59 Cal. 404; *The Slaughter-House Cases*, 16 Wall. 36, 62, et seq.; *Ailstock* v. *Paige*, 77 Va. 386; *In re Lester*, 77 Va. 663; *Commonwealth* v. *Merriam*, 136 Mass. 433; *Muller* v. *Commissioners*, 89 N. C. 171; *State* v. *Mayor*, 15 Vroom (44 N. J. Law), 114; *State* v. *Fay*, 15 Vroom (44 N. J. Law), 474; *Commonwealth* v. *Whelan*, 134 Mass. 206; *In re Liquor Locations*, 13 R. I. 733; *State* v. *Tarver*, 11 Lea, 658.

Under our State constitution, the legislature is prohibited by art. IV., sec. 25, sub. 2, from exercising the local police power; but the power which is denied to the legislature is vested by art. XI., sec. 11, in the municipal corporations throughout the State. *In re Stewart*, 61 Cal. 374; *In re Moynier*, 65 Cal. 33; *In re Soon Hing*, March 13, 1884, by Supreme Court in bank, not reported; *In re Wolters*, 65 Cal. 269; *Barbier* v. *Connolly*, 113 U. S. 27; *Soon Hing* v. *Crowley*, 113 U. S. 703.

The police power is indestructible and inalienable, and being (so far as the regulation of local matters) denied to the legislature, it must reside in the municipalities. The sovereign people have located this power in the municipalities, and it is now too late to question its existence. See observations by Taney, C. J., in *Ohio Life Ins. Co.* v. *Debolt*, 16 How. 416, 428.

In addition to the cases heretofore cited, we refer to the following as recent illustrations of the extent of the police power: *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746; *Foster* v. *Kansas*, 112 U. S. 201; *Missouri Pacific Railway* v. *Humes*, 115 U. S. 512.

Admitting for the sake of argument that the laundry of petitioner was not a fully developed common-law nuisance, we say the State has power to regulate it, as was shown in *Barbier* v. *Connolly*, 113 U. S. 27. The washing of Mr. Barbier was not a nuisance, but it was regulated. See also, *In re Delaney*, 43 Cal. 478.

It has been held that "the State may construe her own laws." *Hall* v. *De Cuir*, 95 U. S. 504, 515. This is what the State has done. And because some other State (Maryland for instance, in *Baltimore* v. *Radecke*, 49 Maryland, 217) has taken a different view, it does not follow that the construction by the

California Courts of their laws should be reversed. We do not question the right of Maryland to make or administer her laws. This decision was presented to the Supreme Court of California in Yick Wo, the case at bar, and our court declined to follow the Supreme Court of Maryland, and adhered to the contrary rule which had long been in force in our State. Ought we to disregard the Supreme Court of California, and follow the Supreme Court of Maryland? Can this court reverse the Supreme Court of California because it refuses to follow the Supreme Court of Maryland and adheres to its own decisions? *In re Frazer*, 54 Cal. 94; *In re Johnson*, 62 Cal. 263.

No disguise will conceal the fact that there is a conflict of authority upon the question we are examining, as will be seen on inspection of a few of the decisions which treat the question at bar.

*Decisions restraining the police power of the State.*—(1878). *Baltimore* v. *Radecke*, 49 Maryland, 217; (1882). July, *In re Quong Wo*, 7 Sawyer, 526, 531.

*Decisions asserting the police power of the State.*—(1871), *In re Ruth*, 32 Iowa, 250; (1871), *Whitten* v. *Covington*, 43 Geo. 421; (1872), *State* v. *Court, etc.*, 7 Vroom (36 N. J. Law), 72; (1873), *Groesch* v. *State*, 42 Ind. 547; (1873), *State* v. *Ludington*, 33 Wis. 107; (1875), *Rohrbacker* v. *Jackson*, 51 Mississippi, 735; (1876), *Kansas Pacific Railroad Co.* v. *Riley*, 16 Kansas, 573; (1879), *Eureka* v. *Davis*, 21 Kansas, 578; (1881), *Pleuler* v. *State*, 11 Neb. 547; (1883), *State* v. *Brown*, 19 Fla. 563.

The Fourteenth Amendment became a part of the Constitution July 28, 1868, and yet we find the States from that time to this asserting and exercising this power.

Mr. JUSTICE MATTHEWS delivered the opinion of the court.

In the case of the petitioner, brought here by writ of error to the Supreme Court of California, our jurisdiction is limited to the question, whether the plaintiff in error has been denied a right in violation of the Constitution, laws, or treaties of the United States. The question whether his imprisonment is illegal, under the constitution and laws of the State, is not open to us. And although that question might have been con-

sidered in the Circuit Court in the application made to it, and by this court on appeal from its order, yet judicial propriety is best consulted by accepting the judgment of the State court upon the points involved in that inquiry.

That, however, does not preclude this court from putting upon the ordinances of the supervisors of the county and city of San Francisco an independent construction; for the determination of the question whether the proceedings under these ordinances and in enforcement of them are in conflict with the Constitution and laws of the United States, necessarily involves the meaning of the ordinances, which, for that purpose, we are required to ascertain and adjudge.

We are consequently constrained, at the outset, to differ from the Supreme Court of California upon the real meaning of the ordinances in question. That court considered these ordinances as vesting in the board of supervisors a not unusual discretion in granting or withholding their assent to the use of wooden buildings as laundries, to be exercised in reference to the circumstances of each case, with a view to the protection of the public against the dangers of fire. We are not able to concur in that interpretation of the power conferred upon the supervisors. There is nothing in the ordinances which points to such a regulation of the business of keeping and conducting laundries. They seem intended to confer, and actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent, not only as to places, but as to persons. So that, if an applicant for such consent, being in every way a competent and qualified person, and having complied with every reasonable condition demanded by any public interest, should, failing to obtain the requisite consent of the supervisors to the prosecution of his business, apply for redress by the judicial process of *mandamus*, to require the supervisors to consider and act upon his case, it would be a sufficient answer for them to say that the law had conferred upon them authority to withhold their assent, without reason and without responsibility. The power given to them is not confided to their discretion in the legal sense of that term, but is granted

to their mere will. It is purely arbitrary, and acknowledges neither guidance nor restraint.

This erroneous view of the ordinances in question led the Supreme Court of California into the further error of holding that they were justified by the decisions of this court in the cases of *Barbier* v. *Connolly*, 113 U. S. 27, and *Soon Hing* v. *Crowley*, 113 U. S. 703. In both of these cases the ordinance involved was simply a prohibition to carry on the washing and ironing of clothes in public laundries and washhouses, within certain prescribed limits of the city and county of San Francisco, from ten o'clock at night until six o'clock in the morning of the following day. This provision was held to be purely a police regulation, within the competency of any municipality possessed of the ordinary powers belonging to such bodies; a necessary measure of precaution in a city composed largely of wooden buildings like San Francisco, in the application of which there was no invidious discrimination against any one within the prescribed limits, all persons engaged in the same business being treated alike, and subject to the same restrictions, and entitled to the same privileges, under similar conditions.

For these reasons, that ordinance was adjudged not to be within the prohibitions of the Fourteenth Amendment to the Constitution of the United States, which, it was said, in the first case cited, "undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one, except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition; and that in the administration of criminal justice no different or higher punishment should be imposed upon

one than such as is prescribed to all for like offences." " Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment."

The ordinance drawn in question in the present case is of a very different character. It does not prescribe a rule and conditions for the regulation of the use of property for laundry purposes, to which all similarly situated may conform. It allows without restriction the use for such purposes of buildings of .brick or stone; but, as to wooden buildings, constituting nearly all those in previous use, it divides the owners or occupiers into two classes, not having respect to their personal character and qualifications for the business, nor the situation and nature and adaptation of the buildings themselves, but merely by an arbitrary line, on one side of which are those who are permitted to pursue their industry by the mere will and consent of the supervisors, and on the other those from whom that consent is withheld, at their mere will and pleasure. And both classes are alike only in this, that they are tenants at will, under the supervisors, of their means of living. The ordinance, therefore, also differs from the not unusual case, where discretion is lodged by law in public officers or bodies to grant or withhold licenses to keep taverns, or places for the sale of spirituous liquors, and the like, when one of the conditions is that the applicant shall be a fit person for the exercise of the privilege, because in such cases the fact of fitness is submitted to the judgment of the officer, and calls for the exercise of a discretion of a judicial nature.

The rights of the petitioners, as affected by the proceedings of which they complain, are not less, because they are aliens and subjects of the Emperor of China. By the third article of the treaty between this Government and that of China, concluded November 17, 1880, 22 Stat. 827, it is stipulated : " If Chinese laborers, or Chinese of any other class, now either permanently or temporarily residing in the territory of the United States, meet with ill treatment at the hands of any other per-

sons, the Government of the United States will exert all its powers to devise measures for their protection, and to secure to them the same rights, privileges, immunities and exemptions as may be enjoyed by the citizens or subjects of the most favored nation, and to which they are entitled by treaty."

The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says : " Nor shall any State deprive any person of life, liberty, or property without due process of law ; nor deny to any person within its jurisdiction the equal protection of the laws." These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality ; and the equal protection of the laws is a pledge of the protection of equal laws. It is accordingly enacted by § 1977 of the Revised Statutes, that " all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." The questions we have to consider and decide in these cases, therefore, are to be treated as involving the rights of every citizen of the United States equally with those of the strangers and aliens who now invoke the jurisdiction of the court.

It is contended on the part of the petitioners, that the ordinances for violations of which they are severally sentenced to imprisonment, are void on their face, as being within the prohibitions of the Fourteenth Amendment ; and, in the alternative, if not so, that they are void by reason of their administration, operating unequally, so as to punish in the present petitioners what is permitted to others as lawful, without any distinction of circumstances—an unjust and illegal discrimination, it is claimed, which, though not made expressly by the ordinances is made possible by them.

When we consider the nature and the theory of our institutions of government, the principles upon which they are sup-

.posed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power. Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts. And the law is the definition and limitation of power. It is, indeed, quite true, that there must always be lodged somewhere, and in some person or body, the authority of final decision; and in many cases of mere administration the responsibility is purely political, no appeal lying except to the ultimate tribunal of the public judgment, exercised either in the pressure of opinion or by means of the suffrage. But the fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws, so that, in the famous language of the Massachusetts Bill of Rights, the government of the commonwealth ".may be a government of laws and not of men." For, the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself.

There are many illustrations that might be given of this truth, which would make manifest that it was self-evident in the light of our system of jurisprudence. The case of the political franchise of voting is one. Though not regarded strictly as a natural right, but as a privilege merely conceded by society according to its will, under certain conditions, nevertheless it is regarded as a fundamental political right, because preservative of all rights.

In reference to that right, it was declared by the Supreme Judicial Court of Massachusetts, in *Capen* v. *Foster*, 12 Pick. 485, 489, in the words of Chief Justice Shaw, "that in all

cases where the constitution has conferred a political right or privilege, and where the constitution has not particularly designated the manner in which that right is to be exercised, it is clearly within the just and constitutional limits of the legislative power, to adopt any reasonable and uniform regulations, in regard to the time and mode of exercising that right, which are designed to secure and facilitate the exercise of such right, in a prompt, orderly, and convenient manner;" nevertheless, "such a construction would afford no warrant for such an exercise of legislative power, as, under the pretence and color of regulating, should subvert or injuriously restrain the right itself." It has accordingly been held generally in the States, that, whether the particular provisions of an act of legislation, establishing means for ascertaining the qualifications of those entitled to vote, and making previous registration in lists of such, a condition precedent to the exercise of the right, were or were not reasonable regulations, and accordingly valid or void, was always open to inquiry, as a judicial question. See *Daggett* v. *Hudson*, 1 Western Reporter, 789, decided by the Supreme Court of Ohio, where many of the cases are collected; *Monroe* v. *Collins*, 17 Ohio St. 665.

The same principle has been more freely extended to the quasi-legislative acts of inferior municipal bodies, in respect to which it is an ancient jurisdiction of judicial tribunals to pronounce upon the reasonableness and consequent validity of their by-laws. In respect to these, it was the doctrine, that every by-law must be reasonable, not inconsistent with the charter of the corporation, nor with any statute of Parliament, nor with the general principles of the common law of the land, particularly those having relation to the liberty of the subject or the rights of private property. Dillon on Municipal Corporations, 3d ed., § 319, and cases cited in notes. Accordingly, in the case of *The State of Ohio ex rel. &c.* v. *The Cincinnati Gas-Light and Coke Company*, 18 Ohio St. 262, 300, an ordinance of the city council purporting to fix the price to be charged for gas, under an authority of law giving discretionary power to do so, was held to be bad, if passed in bad faith, fixing an unreasonable price, for the fraudulent purpose of com-

pelling the gas company to submit to an unfair appraisement of their works. And a similar question, very pertinent to the one in the present cases, was decided by the Court of Appeals of Maryland, in the case of the *City of Baltimore* v. *Radecke*, 49 Maryland, 217. In that case the defendant had erected and used a steam engine, in the prosecution of his business as a carpenter and box-maker in the city of Baltimore, under a permit from the mayor and city council, which contained a condition that the engine was "to be removed after six months' notice to that effect from the mayor." After such notice and refusal to conform to it, a suit was instituted to recover the penalty provided by the ordinance, to restrain the prosecution of which a bill in equity was filed. The court holding the opinion that "there may be a case in which an ordinance, passed under grants of power like those we have cited, is so clearly unreasonable, so arbitrary, oppressive, or partial, as to raise the presumption that the legislature never intended to confer the power to pass it, and to justify the courts in interfering and setting it aside as a plain abuse of authority," it proceeds to speak, with regard to the ordinance in question, in relation to the use of steam engines, as follows: "It does not profess to prescribe *regulations* for their construction, location, or use, nor require such precautions and safeguards to be provided by those who own and use them as are best calculated to render them less dangerous to life and property, nor does it restrain their use in box factories and other similar establishments within certain defined limits, nor in any other way attempt to promote their safety and security without destroying their usefulness. But it commits to the unrestrained will of a single public officer the power to notify every person who now employs a steam engine in the prosecution of any business in the city of Baltimore, to cease to do so, and, by providing compulsory fines for every day's disobedience of such notice and order of removal, renders his power over the use of steam in that city practically absolute, so that he may prohibit its use altogether. But if he should not choose to do this, but only to act in particular cases, there is nothing in the ordinance to guide or control his action. It lays down no

*rules* by which its *impartial execution* can be secured or partiality and oppression prevented. It is clear that giving and enforcing these notices may, and quite likely will, bring ruin to the business of those against whom they are directed, while others, from whom they are withheld, may be actually benefited by what is thus done to their neighbors; and, when we remember that this action or non-action may proceed from enmity or prejudice, from partisan zeal or animosity, from favoritism and other improper influences and motives easy of concealment and difficult to be detected and exposed, it becomes unnecessary to suggest or to comment upon the injustice capable of being brought under cover of such a power, for that becomes apparent to every one who gives to the subject a moment's consideration. In fact, an ordinance which clothes a single individual with such power hardly falls within the *domain of law*, and we are constrained to pronounce it inoperative and void."

This conclusion, and the reasoning on which it is based, are deductions from the face of the ordinance, as to its necessary tendency and ultimate actual operation. In the present cases we are not obliged to reason from the probable to the actual, and pass upon the validity of the ordinances complained of, as tried merely by the opportunities which their terms afford, of unequal and unjust discrimination in their administration. For the cases present the ordinances in actual operation, and the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion, that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the State itself, with a mind so unequal and oppressive as to amount to a practical denial by the State of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the Fourteenth Amendment to the Constitution of the United States. Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal

hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.    This principle of interpretation has been sanctioned by this court in *Henderson* v. *Mayor of New York*, 92 U. S. 259 ; *Chy Lung* v. *Freeman*, 92 U. S. 275 ; *Ex parte Virginia*, 100 U. S. 339 ; *Neal* v. *Delaware*, 103 U. S. 370 ; and *Soon Hing* v. *Crowley*, 113 U. S. 703.

The present cases, as shown by the facts disclosed in the record, are within this class.    It appears that both petitioners have complied with every requisite, deemed by the law or by the public officers charged with its administration, necessary for the protection of neighboring property from fire, or as a precaution against injury to the public health.    No reason whatever, except the will of the supervisors, is assigned why they should not be permitted to carry on, in the accustomed manner, their harmless and useful occupation, on which they depend for a livelihood.    And while this consent of the supervisors is withheld from them and from two hundred others who have also petitioned, all of whom happen to be Chinese subjects, eighty others, not Chinese subjects, are permitted to carry on the same business under similiar conditions.    The fact of this discrimination is admitted.    No reason for it is shown, and the conclusion cannot be resisted, that no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which in the eye of the law is not justified. The discrimination is, therefore, illegal, and the public administration which enforces it is a denial of the equal protection of the laws and a violation of the Fourteenth Amendment of the Constitution.    The imprisonment of the petitioners is, therefore, illegal, and they must be discharged.    To this end,

*The judgment of the Supreme Court of California in the case of Yick Wo, and that of the Circuit Court of the United States for the District of California in the case of Wo Lee, are severally reversed, and the cases remanded, each to the proper court, with directions to discharge the petitioners from custody and imprisonment.*