Anita S. GARZA et al.

v.

Preston SMITH et al.

Civ. A. No. SA–70–CA–169.

United States District Court,
W. D. Texas,
San Antonio Division.

Oct. 16, 1970.

Supplemental Order Oct. 23, 1970.

Pete Tijerina, Mario Obledo, San Antonio, Tex., for plaintiffs.

Pat Bailey, Asst. Atty. Gen. of Texas, Austin, Tex., for defendants.

Before JOHN R. BROWN, Circuit Judge, SPEARS, Chief District Judge and ROBERTS, District Judge.

ROBERTS, District Judge.

[Three illiterate Mexican-American voters of Texas, as representatives of all illiterate voters of Texas, have brought this class action to challenge the constitutional validity of Articles 5.05(15) and 8.13 of the Texas Election Code, V.A.T.S.] All are qualified voters in Texas, but

in their affidavits state that because of their illiteracy they find it impossible to vote for all of the candidates of their choice without assistance at the polls. Both of the challenged articles prohibit assistance in marking or preparing ballots to all voters except those who cannot prepare their ballots "* * * because of some bodily infirmity, such as renders [them] physically unable to write or to see"; Article 5.05(15) specifically provides, in respect to absentee ballots, that "* * * no voter shall be entitled to any assistance in the marking of his ballot on the ground of illiteracy."[1] Plaintiffs contend that these provisions offend the

1. Art. 5.05, Subdivision 15. *Assistance to voter; use of English language.* If a voter is unable to sign his name because of illiteracy, *any signature of the voter required by this section shall be made by the voter's affixing his mark, attested by two witnesses, but no voter shall be entitled to any assistance in the marking of his ballot on the ground of illiteracy.*

No assistance shall be given a voter in marking his absentee ballot except where the voter is unable to prepare the same himself because of some bodily infirmity, such as renders him physically unable to write or to see. If the voter is entitled to assistance, he may be assisted by the clerk, notary public, or other officer before whom the ballot is marked, or by some other person, acting as the witness to assist the voter in event of physical disability, but the person assisting the voter shall *not suggest, by word or sign or gesture,* how the voter shall vote, and shall confine his assistance to answering the voter's questions, to stating the propositions to be voted on, and to naming the candidates and the political parties to which they belong, and he shall prepare the ballot as the voter himself shall direct. Where any assistance is rendered in marking an absentee ballot other than *as allowed in* this subdivision, the ballot shall not be counted but shall be void for all purposes.

In absentee voting by personal appearance at the clerk's office, any voter unable to speak or understand the English language may communicate with the clerk in some other language, and if the clerk is unable to speak or understand the language used by the voter or if he requests that the voter communicate through an interpreter, the voter shall be entitled to communicate through an interpreter of his choice, who shall be a qualified voter in the county. Before acting as interpreter, the person chosen by the voter shall take the following oath, to be administered by the clerk: "I solemnly swear that I will *correctly interpret and translate each* question, answer, or statement addressed to the voter by the clerk and each question, answer, or statement addressed to the clerk by the voter." When any language other than the English language is used either by the voter or by the clerk, any watcher present shall be entitled to request and receive a translation into the English language of anything spoken in some other language.

Art. 8.13 *Aid to voter.* Not more than one person at the same time shall be permitted to occupy any one compartment, voting booth or place prepared for a voter, nor shall any assistance be given a voter in preparing his ballot, except when a voter is unable to prepare the same himself because of some bodily infirmity, such as renders him physically unable to write or to see, in which case two officers of such election shall assist him, they having first sworn that they will not suggest, by word or sign or gesture, how such voter shall vote; that they will confine their assistance to answering his questions, to stating the propositions to be voted on, and to naming candidates and the political parties to which they belong; and that they will prepare his ballot as such voter himself shall direct. If the election is a general election, the election officers who assist such voters shall be of different political parties, if there be such officers present. One or more watchers may be present when the assistance herein permitted is being given, but each watcher must remain silent except in cases of irregularity or violation of the law.

Instead of being assisted by two officers as hereinabove provided, a voter who *is entitled to assistance may select any* qualified voter residing in the precinct to assist him, and no other person shall be permitted to be present while the ballot is being prepared. Before assisting the voter, the person selected shall take the following oath, which shall be administered by one of the election officers: "I solemnly swear that I will not suggest, by word or sign or gesture, how the voter shall vote; I will confine my assistance to answering his questions, to stating propositions to be voted on and to naming candidates and the political parties to which they belong; and I will prepare his ballot as the voter himself shall direct."

Where any assistance is rendered in preparing a ballot other than as herein allowed, the ballot shall not be counted, but shall be void for all purposes.

Fourteenth Amendment by invidiously discriminating between illiterate voters and physically handicapped voters in violation of the Equal Protection Clause and by totally or partially depriving functionally illiterate Texas voters of their fundamental right to vote in violation of the Due Process Clause. For the reasons set out below, we agree with plaintiffs' claim of discrimination under the Equal Protection Clause and grant declaratory relief.

## I. EQUAL PROTECTION

The Supreme Court has long recognized that voting is " * * * a fundamental political right, because preservative of all rights." Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). While the states have long been held to have broad powers to determine the conditions under which the right to vote may be exercised, Lassiter v. Northhampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1958), once the states grant the franchise, they must not do so in a discriminatory manner. Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). Because of the overriding importance of voting rights, classifications that " * * * might invade or restrain them must be closely scrutinized and carefully confined * * * " where those rights are asserted under the Equal Protection Clause, especially where lines are drawn on the basis of wealth or race. Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). The test to be applied has been concisely stated, in another context by Mr. Justice Harlan:

> The matrix of recent "equal protection" analysis is that the "rule that statutory classifications which either are based on certain 'suspect' criteria, or affect 'fundamental rights' will be held to deny equal protection unless justified by a 'compelling' governmental interest," * * * Williams v.

Illinois, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (June 29, 1970) (concurring opinion).

Thus, in cases questioning the validity of laws conditioning exercise of the right to vote upon the ownership of property or the payment of taxes, the Court has found no such compelling interest attaching to elections concerning public school issues, Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), revenue bonds, Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), and general obligation bonds, City of Phoenix, Arizona v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (June 23, 1970). The Court has likewise found no compelling state interest to justify a statutory scheme giving established political parties decided advantages over new parties in gaining places on the state ballot to choose presidential electors. Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L. Ed.2d 24 (1968). Classifications based on race have, of course, been held indefensible even where established by an institution only indirectly connected with state government, such as a political party primary. Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). However, where the statutory scheme under attack is not drawn on the basis of wealth or race and is not shown to have an impact on the citizen's ability to exercise the fundamental right to vote, a considerably less exacting approach obtains. In such cases, state legislatures are presumed to have acted constitutionally and their statutory classifications will be set aside only if no grounds can be conceived to justify them. "The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal." McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969), and cases

cited. Thus the legal standard to be applied in this case depends on the precise basis and effect of the statutes in question.

We begin our consideration of this preliminary problem with an analysis of just what the challenged articles forbid and permit, as evidenced by the statutory scheme of which they are a part. Disregarding certain disqualifications not relevant here and other provisions previously invalidated by court decisions, a qualified Texas voter is defined by the state constitution to be any person " * * * who shall have attained the age of twenty-one (21) years and who shall be a citizen of the United States and who shall have resided in this State one (1) year next preceding an election and the last six (6) months within the district or county in which such person offers to vote." [2] Thus literacy is not made a prerequisite to voter qualification. The challenged provisions deal instead with the assistance that may be rendered to a voter by election officials in the preparation of his ballot. Moreover, although Article 5.05(15) specifically provides that "no voter shall be entitled to any assistance in the marking of his ballot on the ground of illiteracy," this must be read together with language in both Article 5.05(15) and Article 8.13 that denies such assistance to *all* voters *except* those who are unable to prepare their ballots "because of some bodily infirmity, such as

renders [them] physically unable to write or to see." The statutes therefore prohibit assistance to all voters except those who are unable to perform the mechanical act of voting or visually perceive the ballot. Such assistance, in the case of those entitled to receive it, may be rendered in respect to absentee voters by "the clerk, notary public or other officer before whom the ballot is marked, or by some other person, acting as the witness to assist the voter in event of physical disability", and in respect to resident voters at district polls by two officers of the election (who must be of different political parties in the case of general elections, if such officials are present) or by any qualified voter residing in the district who has been selected by the voter entitled to assistance. All persons rendering assistance must swear " * * * that they will not suggest, by word or sign or gesture, how such voter shall vote; that they will confine their assistance to answering his questions, to stating the propositions to be voted on, and to naming candidates and the political parties to which they belong; and that they will prepare his ballot as such voter himself shall direct." Article 8.13a [3] further provides that no election judge or clerk "shall use any language other than the English language in performing any duty as such judge or clerk of the election, except that it shall be permissible for him to use some other language

2. Tex.Const. art. 6, § 2 (1876).

3. Art. 8.13a *Use of English language; interpreter.* No election judge or clerk shall use any language other than the English language in performing any duty as such judge or clerk of the election, except that it shall be permissible for him to use some other language when examining, aiding, or giving instructions to a voter who does not understand the English language. Any voter unable to speak or understand the English language may communicate with the election officer in some other language, and if the election officer is unable to speak or understand the language used by the voter or if he requests that the voter communicate through an interpreter, the voter shall be

entitled to communicate through an interpreter of his choice, who shall be a qualified voter in the precinct. Before acting as interpreter, the person chosen by the voter shall take the following oath, to be administered by the presiding judge: "I solemnly swear that I will correctly interpret and translate each question, answer, or statement addressed to the voter by any election officer and each question, answer, or statement addressed to any election officer by the voter." When any language other than the English language is used either by the voter or by an election officer, any election officer or any watcher shall be entitled to request and receive a translation into the English language of anything spoken in another language.

when examining, aiding, or giving instructions to a voter who does not understand the English language", and that the voter may, if necessary communicate with the election officer through an interpreter. In the absence of an interpretation of these provisions by the Texas Supreme Court, we assume that the foregoing statutory scheme absolutely prohibits any assistance whatever to illiterate voters [4] in determining the basis upon which these provisions are drawn and the impact, if any, they may have upon the illiterate voters' ability to exercise the fundamental right to vote.

We find nothing in the statutory scheme to suggest that it is based on wealth or race. The provisions levy no tax or fee as a prerequisite to voting, as in the poll-tax cases, nor do they directly condition the franchise upon the citizen's economic status, as in the cases condemning such voting prerequisites as property ownership or the payment of taxes. No statistics are needed to conclude that most illiterate voters have very low incomes, and from this it might be argued that by denying assistance to such voters the state has indirectly conditioned the franchise upon economic status. Although the effect of the statute may well be to exclude a substantial number of low-income voters from assistance the statute nevertheless does not in its terms require attainment of a certain income level as a prerequisite to receiving assistance but rather denies assistance to all physically able voters, regardless of their economic status. We therefore cannot say that the provisions under attack are based even indirectly on wealth. We reach a similar conclusion in answer to the contention that the statute is based on race. [Plaintiffs have offered statistics and expert testimony tending to establish that the majority of illiterate voters in Texas are members of the Mexican-American and Negro ethnic groups.] [It is said that this has resulted from the negligence of the state in its efforts to upgrade the public education offered to minority groups and that the provisions under attack perpetuate this past discrimination by affording its victims no chance to obtain redress at the polls.] While we might again agree that the effect of the statute may be to exclude many Mexican-Americans and Negroes from assistance, the distinction drawn by the statute is between physically able voters and physically incapacitated voters; the provisions are not drawn along racial lines. The inquiry thus narrows to whether the voter assistance provisions of the Texas Election Code have an impact

4. Although counsel for defendant took this position during oral argument, the extent of the prohibition against assistance to voters is not clear from Texas decisions construing the articles. It has been held that an election judge who, in response to a voter's inquiry, explained how the voter should mark his ballot in order to express his wish and desire on a school consolidation issue did not render unauthorized "assistance" within the meaning of Article 8.13. McJimsey v. Yates, 324 S.W.2d 438 (Tex.Civ.App. Texarkana 1959, writ dism'd). The same court has intimated that Article 8.13 would, in a proper case, probably be held unconstitutional as depriving illiterate persons of their franchise, and has held that proof that voters did not have specified physical ailments is insufficient to show unauthorized assistance for purposes of contesting an election result, even where some of the evidence indicated that illiteracy may have been the reason for the assistance rendered. Mitchell v. Jones, 361 S.W.2d 224 (Tex.Civ.App. Texarkana 1962, no writ). Both opinions agree that the assistance referred to by the statute means assistance in marking the ballot, and that the statute should be liberally construed in favor of the right to vote. It may be, therefore, that the articles under attack do not absolutely preclude the type of assistance that plaintiffs contend is essential to an effective exercise of their right to vote, that is, indicating to the illiterate voter which mark or move of the voting lever will effectuate his desire to vote, but rather only prohibit the election official from physically marking the ballot or moving the lever himself. We do not believe, however, that we may properly reach this conclusion without an authoritative interpretation of the statutory provisions by the Texas Supreme Court.

upon an illiterate voter's ability to exercise his fundamental right to vote, a question that necessarily turns upon an analysis of the right itself.

If the "right to vote" consists only of the right to enter the voting booth without hindrance or discrimination, perform the physical act of voting, and have the vote so recorded counted in the total of like votes cast, we cannot say that the challenged provisions have an impact on the illiterate voter's ability to exercise the right. Except for physically disabled or blind illiterates, as to whom the issue is moot, an illiterate voter is capable of performing each element of the "right to vote", as defined above, without hindrance from the statutes in question. We decide, however, that the "right to vote" additionally includes the right to be informed as to which mark on the ballot, or lever on the voting machine, will effectuate the voter's political choice. We are aided in reaching this conclusion by the rationale aptly expressed by Judge Wisdom in considering the impact of the Voting Rights Act of 1965 upon provisions of Louisiana law similar to those in question here:

> "We cannot impute to Congress the self-defeating notion that an illiterate has the right to pull the lever of a voting machine, but not the right to know for whom he pulls the lever." United States v. Louisiana, 265 F. Supp. 703, 708 (E.D.La.1966), aff'd 386 U.S. 270, 87 S.Ct. 1023, 18 L.Ed. 2d 39 (1967). See also, United States v. Mississippi, 256 F.Supp. 344, 348 (S.D.Miss.1967).

Although neither the Voting Rights Act of 1965 nor the 1970 Amendments thereto are applicable to the case at bar,[5] the obvious sense of the above

---

5. The Voting Rights Act of 1965, 42 U.S.C. § 1973, et seq. suspended all voter qualification statutes based on literacy educational achievement, moral character, or personal vouchers in Alabama, Georgia, Louisiana, Mississippi, South Carolina, Virginia, and certain counties in Arizona, Hawaii and North Carolina, and provided for federally supervised voter registration and elections in those jurisdictions. Since Texas has never had such qualifications and was not included in the list of jurisdictions covered, the 1965 Act is clearly not applicable. The 1970 Amendments to the Act, Pub.L.No.91–285, U.S.Code Cong.Admin. News (July 20, 1970) provide, in pertinent part:

> "Sec. 201(a) Prior to August 6, 1975, no citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State or local election conducted in any State or political subdivision of a state as to which the provisions of * * * this Act are not in effect * * *."

> (b) As used in this section, the term test or device means any requirement that a person as a prerequisite to voting or registrations for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, * * *."

The original Act further provides:

> "The term 'vote' or 'voting' shall include all action necessary to make a vote effective * * * including, but not limited to * * * casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election. 42 U.S.C. § 1973(c) (1). Plaintiffs contend that these provisions, read together, bring articles 5.05(15) and 8.13 of the Texas Election Code within the ambit of the Voting Rights Act, as amended. They argue that the prohibition against assistance to illiterates is a "device" within the meaning of Sec. 201 (b) because in order to mark a ballot or pull a voting machine lever, other than randomly, a voter must demonstrate an ability to read, and that this "device" denies the "right to vote" because reading the ballot is an "action necessary to make a vote effective" within the meaning of 42 U.S.C. § 1973(c) (1). We do not read these provisions quite so broadly. Under the Texas statutes, a person is not required to demonstrate anything upon his arrival at the polls except that he is a qualified voter. Presumably an illiterate voter, upon proving his qualifications, could step into the booth without hindrance and perform the physical motions of voting without demonstrating as a prerequisite any ability to read or write. We therefore do not regard these articles as a "device" within the meaning of the Act.

quotation is particularly apposite here. The "self-defeating notion" that Judge Wisdom could not impute to Congress we cannot impute to the democratic process lying at the heart of our governmental system. We cannot perceive how exercise of the "fundamental right to vote", which Texas undeniably grants to all illiterates who meet the qualifications prescribed by the state constitution, can be more than an empty ritual if the right itself does not include the right to be informed of the effect that a given physical act of voting will produce.

It follows that the provisions under attack have a substantial impact on the ability of the illiterate voter to exercise his franchise, as we have defined it. The requirement in both articles that the person rendering assistance shall "prepare [the] ballot as [the] voter himself shall direct" and refrain from suggesting, "by word or sign or gesture, how [the] voter shall vote" are bottomed on the premise, however valid it may be in fact, that at some point prior to marking the ballot or moving the voting lever the voter formulates the political choice he wishes to make. Absent any voter assistance provisions whatever, a voter would thus have to be able to do three things at the polling place in order to transform his predetermined political choice into a recorded vote. He would have to be capable of (1) visually perceiving the alternatives listed, (2) mentally identifying the alternative that coincides with his predetermined choice, and (3) performing the physical manipulation necessary to record that choice. A physically able voter with unimpaired vision could do all three. A blind voter could mentally identify his choice and manipulate, but could not visually perceive. A physically incapacitated voter could visually perceive and mentally identify his choice, but could not manipulate. An illiterate voter could visually perceive and manipulate, but could not mentally identify the alternatives. We think it clear, therefore, that the voter assistance provisions of the Texas Election Code have a substantial impact on the illiterate voters' ability to exercise his franchise. He is just as surely disabled as the blind or physically incapacitated voter, and therefore equally in need of assistance, yet the statutes forbid anyone to help him.

We think the foregoing analysis also demonstrates adequately the discriminatory nature of the provisions under attack. Two classifications are established: (1) Voters afflicted with some "bodily infirmity" that prevents them from performing the physical act of voting, and (2) all other voters. Voters in the first classification are entitled to assistance; voters in the second classification are not. Illiterate voters, although they possess an infirmity that prevents them from casting their vote, are lumped with all other voters and denied assistance by the statute. The statute thus treats voters in like circumstances differently in respect to their fundamental rights, and is therefore discriminatory.

Since we have decided that the statute has an impact on the ability of an illiterate voter to exercise his fundamental right to vote, and discriminates against him, its provisions can be sustained under the Equal Protection Clause only if they are justified by a "compelling state interest." Harper v. Virginia Board of Elections, supra; Kramer v. Union Free School District No. 15, supra; Cipirano v. City of Houma, supra; City of Phoenix, Arizona v. Kolodziejski, supra. The compelling state interest asserted in this case is the prevention of fraud and undue influence in the conduct of elections. Indeed, since the Texas Constitution limits the state legislature's power to regulate elections to that legislation necessary "to detect and punish fraud and preserve the purity of the ballot box" [6] and to protect the exercise

6. Tex.Const. art. 6, § 4 (1876).

of free suffrage from "all undue influence * * * [by] power, bribery, tumult, or other improper practice," [7] we think that the prevention of fraud and undue influence is the only state interest that could be involved. The danger, then, that the state wishes to guard against through the voter assistance provisions is the substitution of the will of some other person for that of the voter. We have no doubt that the state's interest in this regard is sufficiently compelling, but our task is to determine whether it justifies the discrimination inherent in the challenged articles when the latter are scrutinized with the care the law demands.

We first inquire whether Articles 5.05(15) and 8.13 are drafted so as best to accomplish the state's goal of preventing fraud and undue influence. As we have observed, the dangers are that the person rendering assistance will mark the ballot in accordance with his own purpose instead of that of the voter, falsely represent to the voter that a given mark will record his political choice, take advantage of his presence in the voting booth to influence the choice of those voters who are vulnerable to pressure, or otherwise substitute his will for that of the voter. It is readily apparent that short of denying assistance to all voters, which would unfairly disenfranchise not only the illiterate but also the crippled and blind, no statutory scheme could absolutely prevent such dishonesty from occurring. Given, then, that any assistance scheme will present some opportunity for fraud and undue influence, the danger would be eliminated as to voters able to see the ballot, and minimized as to the blind and illiterate, by provisions limiting the assistance authorized strictly to marking the voter's ballot in accordance with the choice he announces. But Articles 5.05(15) and 8.13 go much further and allow the assisting person, at the request of the assisted voter, to answer the voter's questions, state the proposi-

tions to be voted on, and name the candidates and the political parties to which they belong. Even though the assistant must swear not to suggest to the voter how to vote, and to mark the ballot as the voter directs, it is obvious that these provisions are rife with opportunity for fraud and undue influence. We believe that the generous measure of assistance permitted vitiates the protective purpose to be served by the statute to such a degree that the discrimination against illiterate voters cannot be justified on the ground that the statute itself prevents fraud and undue influence.

The state might grant, however, that the provisions in question do not and could not absolutely foreclose election fraud, but argue that by limiting the assistance authorized to blind and crippled voters the provisions limit the fraud that could be practiced to a group of voters so small in comparison with the entire electorate that the outcome of most elections would not be significantly affected. By extending assistance to the much larger group of illiterate voters, the state would risk a substantial magnification of whatever fraud might be practiced at the polls. Under this approach, the state interest justifying the denial of assistance to illiterate voters would not be absolute prevention of fraud, but instead limitation of the number of votes that could be affected by any fraud actually committed during an election. Our difficulty with this argument, which has not been advanced by defendants, is that it is not supported by the evidence before us. We do not have and probably could not obtain information as to the number of votes affected by fraudulent application of the voter assistance provisions in Texas elections. The statistics cited to us by plaintiffs do reveal that in 1960, Texas had approximately 700,000 citizens aged 25 and over who had completed less than five years of schooling and were, by definition, "functional

---

7. Tex.Const. art. 16, § 2 (1876).

illiterates." Even though we may assume, however, that this number is now substantially larger, we cannot conclude that all "functional illiterates," or even the majority of them, need assistance at the polls and therefore would be vulnerable to fraud or undue influence. Any estimation we might attempt as to the number of votes that might be subjected to fraud by extending assistance to illiterates would necessarily be mere speculation. On the other hand, we do have evidence that very little difficulty with fraud has been experienced in those states that do permit assistance to illiterate voters.[8] We are therefore unwilling to consider the discriminatory aspects of the Texas statute justified by a state interest that is, on the basis of the evidence now before us, only a plausible hypothesis.

Having concluded that Articles 5.05 (15) and 8.13 of the Texas Election Code have an impact on the illiterate voter's ability to exercise his franchise, that they discriminate against the illiterate voter, and that they cannot be justified by the state's interest in preventing or limiting election fraud, we accordingly hold that these articles violate the Equal Protection Clause of the Fourteenth Amendment insofar as they withhold from illiterate voters the assistance they authorize in respect to blind and crippled voters.

## II. DUE PROCESS

Plaintiffs alternatively contend that the right to vote is a fundamental personal liberty guaranteed by the Due Process Clause, and that the statutes in question partially or totally deprive illiterates of this liberty without due process. We observe that there is an element of fundamental unfairness in a statutory scheme that purports to assist physiologically blind voters but not mentally blind voters, resulting in the effective disenfranchisement of the latter but not the former. However, the gravamen of plaintiffs' complaint is unequal treatment under the laws, and we have accordingly thought it more appropriate to analyze the issues presented under the aegis of the Equal Protection Clause.

## III. FORM OF RELIEF

We have held that Articles 5.05 (15) and 8.13, on their face violate the Equal Protection Clause insofar as they withhold from illiterate voters the assistance they authorize in respect to blind and crippled voters, and plaintiffs herein are therefore entitled to a declaratory judgment to that effect. Ordinarily, the granting of a remedial injunction would also be appropriate. However, we decline to take this further step, under the special circumstances presented here, for the following reasons:

(1) Only a short time remains until the next general election in Texas, which is to be held on November 3, 1970, and it would be a practical impossibility to disseminate and implement the supervisory rules that such an injunction would necessarily have to contain throughout the two hundred fifty-four (254) counties of Texas without disrupting and confusing the orderly conduct of the impending election.

(2) The limited time remaining before the election would not permit the calm, unhurried study and deliberation that this Court would need in order to fashion such rules.

(3) Most important, we deem the state's interest in preventing election fraud to be of sufficient importance to warrant granting to the Texas Legislature an opportunity to remedy the deficiencies in the statute that we have pointed out. We are of the opinion that the delicate task of fashioning election

---

8. Plaintiffs submitted interrogatories to appropriate officials in each of the 26 states that presently provide by statute for assistance to illiterate voters, inquiring whether any difficulty had been experienced in administering these laws. Of the 16 answers received, only two reported any instances of difficulty with fraud or undue influence, while 14 reported no difficulties whatsoever.

rules that will fully protect the constitutional rights of illiterate voters and at the same time guard as fully as possible against the dangers of election fraud can best be accomplished through the legislative process.

## IV. ORDER

This cause having come on for trial at which all parties were present by counsel; and the Court having considered the pleadings, evidence, and argument of counsel; the Court believes that an order should be entered in accordance with this opinion, which also constitutes the Court's findings of fact and conclusions of law under Rule 52 (a) of the Federal Rules of Civil Procedure.

It is accordingly ordered, adjudged and decreed:

(1) Declaratory Judgment. That Articles 5.05(15) and 8.13 of the Texas Election Code be, and are hereby, declared unconstitutional insofar as they withhold from or deny to illiterate, qualified voters of Texas the assistance they authorize in respect to other qualified voters of Texas who, by reason of some bodily infirmity, are physically unable to write or see.

(2) Injunctive Relief. That plaintiffs' prayer for a preliminary or permanent injunction prohibiting the State of Texas from applying or enforcing Articles 5.05(15) and 8.13 of the Texas Election Code, insofar as they forbid to illiterate voters the assistance they authorize to voters who by reason of some bodily infirmity are physically unable to write or see, and ordering the State to provide such assistance to illiterate voters be, and is hereby, denied; *provided, however,* in the event the 62nd Texas Legislature, which will convene in January of 1971, fails to enact appropriate legislation to remedy the deficiencies in the statute, as we have pointed out, before it adjourns, the plaintiffs may apply to this Court for injunctive relief, and jurisdiction of this cause will be retained for that purpose should it become necessary.

JOHN R. BROWN, Circuit Judge (concurring in part and dissenting in part).

I concur fully in the able opinion of Judge Roberts and the Order except insofar as it withholds relief as to these plaintiffs. I do not minimize the opportunity for fraud that is suggested. Legislative re-apportionment and congressional re-districting might make it wise to allow Texas time to make legislative adjustments. I think that an injunction is in order insofar as it would be effective against party defendants.

Without doubting in the least that election officials will treat our declaration with the same respect as an injunctive order, illiterate voters who suffer discrimination ought not to have to depend on this assumption for full protection of their rights. Of course, an injunction would carefully construct the relief we are granting and non-lawyer election officials would have this spelled out at the very time illiterate voters present themselves to cast their ballot or as effects the assistance to be given. I think we could, with the aid of counsel, construct such an injunction.

## SUPPLEMENTAL ORDER

SPEARS, Chief District Judge.*

On this the 23rd day of October 1970, came on for consideration plaintiffs' motion for clarification of this Court's order of October 16, 1970 to the effect that "the Secretary of State of the State of Texas in issuing immediate instructions to the proper election officials that assistance can be given illiterate voters requesting same is not in violation of the aforesaid order of this Court."

---

* Acting for and on behalf of all three judges designated to hear and determine this cause, with full authority from each such judge to so act.

Article 1.03 of the Texas Election Code provides, among other things, that:

"The Secretary of State shall be the chief election officer of this state, and it shall be his responsibility to obtain and maintain uniformity in the application, operation and interpretation of the election laws. In carrying out this responsibility, he shall cause to be prepared and distributed to each county judge, county tax assessor-collector, and county clerk, and to each county chairman of a political party which is required to hold primary elections, detailed and comprehensive written directives and instructions relating to and based upon the election laws as they apply to elections, registration of electors and voting procedures which by law are under the direction and control of each such respective officer. Such directives and instructions shall include sample forms of ballots, papers, documents, records and other materials and supplies required by such election laws. He shall assist and advise all election officers of the state with regard to the application, operation and interpretation of the election laws."

In a letter addressed to counsel for plaintiffs, dated October 22, 1970, and attached to said motion as Exhibit A, the Secretary of State has expressed concern "as to whether illiterate voters may be assisted in voting at the present election or whether the order is to be implemented only after the Legislature has had an opportunity to amend the statutes." In this connection, the Secretary of State says: "This office still has the capability of disseminating instructions to all election officials in the state in time for the November 3rd elections."

On the basis of the record before us when our prior order was entered, we felt that the limited time remaining before the election was not sufficient to enable us to fashion supervisory rules to fully protect the constitutional rights of illiterate voters, and at the same time guard as fully as possible against the dangers of election fraud. Significantly, there was no indication at that time that any state election official thought he could do it either. All of this led to our conclusion that such matters could best be handled through the legislative process. However, it now appears that the Secretary of State sees no problem in this area, and, under the circumstances, we have no desire to interfere with him in the exercise of his sound judgment and discretion, as the chief election officer of the state, in determining whether or not the Texas election laws can be properly and fairly administered in light of our order of October 16, 1970. Certainly, our said order was not intended to conflict in any way with the Secretary of State's proposal, and we so hold.