## DISTRICT OF COLUMBIA *v.* HAZEL.

POLICE REGULATIONS; CAB STANDS; REASONABLENESS OF
MUNICIPAL REGULATIONS.

Where under the joint resolution of Congress of June 7, 1898, authorizing the Commissioners of the District of Columbia to locate in the streets adjacent to the station of any railroad company in this District a stand for the cabs of any such company, the Commissioners made a police regulation assigning to a railroad company whose station was on a corner, one-half of an adjacent cab stand on one street, and 100 feet out of 160 feet of cab stand adjacent on the other and intersecting street, the other portion of each stand being assigned for the use of public cabs, it was *held*, reversing a judgment of the police court quashing an information against a public cabman for violation of such regulation, that it was proper for the Commissioners to apportion the cab spaces in question in some way, and the apportionment as fixed by the regulation was not unreasonable on its face, but that whether the apportionment made was a reasonable one was a question of fact to be determined by proof, the burden being upon the defendant to overcome the presumption which obtained that the apportionment made was reasonable; Mr. Justice SHEPARD dissenting.

No. 911. Submitted November 22, 1899. Decided March 16, 1900.

IN ERROR to the Police Court of the District of Columbia. *Judgment reversed.*

The facts are sufficiently stated in the opinion.

*Mr. A. B. Duvall*, Attorney for the District of Columbia, *Mr. Clarence A. Brandenburg*, Assistant Attorney, and *Mr. Fred D. McKenney* for the plaintiff in error.

*Mr. D. W. Baker* and *Mr. J. C. Gittings* for the defendant in error.

Mr. Justice MORRIS delivered the opinion of the Court:

This is an appeal by the District of Columbia from an order of the police court quashing an information against the defendant George Hazel, whereby he was charged with the violation of the police regulations of the District, in this, that, being the driver of a licensed vehicle for the conveyance of passengers for hire, he occupied with his vehicle a portion of the hackstand adjacent to the Baltimore and Potomac Railroad Company's station in this city set apart for the sole use of the vehicles of that company. The defense was the alleged illegality of the police regulation made by the Commissioners of the District, whereby they set apart a portion of the public hackstand adjacent to the station for the sole use of the cabs of the railroad company and another portion of the same stand for other cabs. It was claimed that this was unlawful discrimination, violative of the common and equal right of all persons to use the streets equally. Accordingly, a motion to quash the information was interposed; and it was sustained by the police court. Upon exception duly taken to this ruling, the District of Columbia has appealed to this court.

This case is a sequel to that of *Curry* v. *District of Columbia*, 14 App. D. C. 423. In the opinion in that case the legislation by Congress, and the action of the Commissioners of the District thereunder, which led to the institution of that suit, and which also in a measure superinduced the present proceeding, were fully stated, and need not be here repeated. Suffice it to say, that under authority of a joint resolution of Congress, approved June 7, 1898, which authorized the Commissioners to locate on the streets adjacent to

the station of any railroad company in the District a stand for cabs of such railroad company, to be maintained by it for the conveyance of passengers for hire to and from such railroad station, the Commissioners assigned the whole of the cab stand adjacent to the station of the Baltimore and Potomac Railroad Company to the sole use of the cabs of that company, and excluded all other cabs therefrom.

In the *Curry* case we held this regulation of the Commissioners to be null and void as giving an exclusive and unlawful preference to the railroad company, and we said:

" This regulation of the Commissioners, therefore, in so far as it assumes to confer exclusive privileges on the railroad company, must be regarded as void and of no force in law. And so far as the joint resolution of Congress can be construed as authorizing a concession of such exclusive privileges, that joint resolution likewise must be taken as equally obnoxious to the principle of equality and equally invalid. If, however, the joint resolution is to be construed simply as giving the railroad company the power to conduct a cab business in the District of Columbia upon equal terms with other persons, and the principle of equality can be subserved by the assignment of a portion of the stand in question to the railroad company and of a portion to other persons, in regard to which it is unnecessary here to express an opinion, inasmuch as there is no such case before us, it is possible that the joint resolution might be taken as unobjectionable. It is evident that the Commissioners construed the resolution as authorizing them to give the preference which they gave to the railroad company; and it is this construction, and the action of the Commissioners in pursuance of such construction, which we regard as being in violation of the Constitution and of common right."

Induced, apparently, by the reservation contained in our opinion in that case, the Commissioners revised and amended their regulation, and promulgated a new one on May 13, 1899, whereby, instead of assigning to the railroad

company the whole of the adjacent cabstand, they provided that one-half of the stand adjacent on Sixth street, and 100 feet out of 160 feet of stand adjacent on B street, should be for the sole use of the cabs of the railroad company; and that the other half of the stand on Sixth street and the remaining 60 feet of the stand on B street should be for the use of other cabs. And it was further provided that no driver of any other vehicle than those of the railroad company should occupy the spaces so set apart for the exclusive use of the company, under a penalty not to exceed $40. It is this amended regulation which the defendant is charged with having violated by an attempt to occupy a part of the space assigned to the railroad company; and it is the validity of this amended regulation which is here sought to be determined. Apparently on the presumption of its invalidity, the police court quashed the information; and we are now asked to review that ruling.

That the matter of the regulation of cabs and cabstands is a proper subject for municipal regulation, can not well be denied. In a great city like our own, it is a necessary result of the municipal control over the streets and public places that the occupancy of them by cabs and the assignment of portions of them for cabstands, being an exceptional use of them and somewhat derogatory of the rights of the general public, should be subjected to strict municipal regulation. The spaces set apart for cabstands must necessarily be limited in extent. The number of vehicles to occupy any one stand must likewise be limited. It is necessary that there should be order and arrangement in their location and in the mode of their occupation. This order and arrangement it is for the municipal authorities to determine in the interest of the peace and quiet of the community, and not for the drivers or occupants of the stands to determine for themselves according to their own whims or caprices, which might readily result in riotous disorder. Consequently, it is competent for the municipal authorities,

in the exercise of their judgment and of a sound discretion, to assign a special place for each and every vehicle and for each and every group and class of vehicles; and their discretion in such apportionment is not the subject of review by the courts, except for plain and palpable abuse of it. In such an apportionment there must necessarily be preference to some extent, because some one or more places may be deemed more advantageous than others; and not all can have those places at the same time. Such preferences are unavoidable. Not absolute equality is required in such matters, but reasonable equality under all the circumstances. To set apart, therefore, a specific part of the stand here in question for the cabs of the railroad company is not in itself improper, and can be no more objectionable than to set apart a certain specified place for the one cab of A, and a certain other specified place, twice as large as the former, for the two cabs of B, and still another specified place, ten times as large as the first, for the ten cabs of C, if C should have so many. Such an arrangement may be even a matter of necessity as well as of propriety; and it is plainly within the discretion of the municipal authorities. The only question open in such cases for the consideration of the courts, under proper limitations, is that of the reasonableness of the apportionment; and this is a question of fact to be determined upon testimony, and not a question of law for determination by a court without reference to the circumstances.

The principle of the decision of this court in the case of *Moore* v. *Dist. of Col.*, 12 App. D. C. 537, is fully applicable to this situation. In that case, upon an information in the police court for the violation of a police regulation made by the Commissioners of the District, providing that no bicycle should be ridden on the streets of the city of Washington with the lower end of the handlebars on a plane lower than four inches below the top of the saddle at its center, a ruling of the police court to the effect that the regulation on its

face was reasonable and valid, without any reference to the
testimony adduced by the defendant in the case to show its
unreasonableness and invalidity, and in total disregard of
such testimony, was reversed by this court on appeal; and
it was held that the case was one proper to be determined
upon testimony.

Now, in the present case, the question of the apportion-
ment of the spaces of the cab stand adjacent to the station
of the Baltimore and Potomac Railroad Company between
the cabs of that company and other cabs simply raises an
issue of fact as to the reasonableness of the apportionment.
We have said that it was proper to make an apportionment
of some kind; and this apportionment is not unreasonable
on its face.   Whether it was unreasonable in fact depends
upon the circumstances; and these must be shown in proof.
The municipal authorities having the general power to
make the apportionment, the presumption of reasonableness
attends their exercise of the power; and it is incumbent on
the defendant to overcome the presumption by satisfactory
proof to the contrary.

We conclude that it was error on the part of the police
court to quash the information in this case.   The cause
will, therefore, be remanded to that court, with directions
to vacate the order quashing the information, to deny the
defendant's motion to quash, and for further proceedings
according to law and in conformity with this opinion; and
it is so ordered.

Mr. Justice SHEPARD dissenting:

I can not agree that the apportionment of the space to be
occupied by public hacks and carriages engaged in the
transportation of persons to and from the railway station is
reasonable upon the face of the regulation attempted to be
enforced in this case.

Certainly it would be more satisfactory if we had before
us evidence disclosing all the conditions prevailing at the

time, including the number of public hacks and carriages then in ordinary use, belonging to the railway company and to other owners respectively, but it is not at all necessary.

This regulation, both in its nature and operation, is essentially different from that involved in *Railway Co.* v. *Dist. of Col.*, 10 App. D. C. 111, 128, wherein it was said: "Had the appellants undertaken to obey the regulation, in good faith, and to give its operation a fair test before engaging in litigation to prevent its enforcement, we might have had abundant evidence before us by which the question of its reasonableness, under all the surrounding circumstances, could readily be determined."

The apportionment of the space is made by the following sections of the amended or substituted regulation:

"Sec. 12. That so much as may be necessary of the west half of Sixth street from the south building line of B street northwest, to the line of the south wall of the Baltimore and Potomac Railroad Company's station building, be and the same is hereby designated and set apart as a stand for omnibuses of licensed hotels; and so much of the west half of said street from the line of said south wall to the line of the south end of the train shed as may not be required for the convenient transaction of public business pertaining to or connected with said railroad station, including the receiving, handling, and delivery of the mails, baggage, express and freight, is hereby designated as a stand for hacks and vehicles plying for hire; the north one-half of the space so allotted to hacks and vehicles plying for hire shall be for the sole use of the cabs, carriages, and other vehicles of the Baltimore and Potomac Railroad Company engaged in carrying passengers to and from its station."

"Sec. 13. That so much of the south half of B street north from the line of the west wall of the Baltimore and Potomac Railroad Company's station building, westerly to a point distant one hundred and sixty feet therefrom, as may be

16 Ct. App.—20

necessary to accommodate a double line of vehicles, placed parallel with the curb, be and the same is hereby designated and located as a stand for hacks and vehicles plying for hire; provided, however, that the easternmost one hundred feet in length of said space by its entire width is hereby set apart for the sole use of the cabs, carriages and other vehicles of the said railroad company engaged in carrying passengers to and from its station."

Comparing this with that declared unreasonable on its face in *Curry* v. *Dist. of Col.*, it is quite clear to my mind that it accomplishes practically, though indirectly, all that was expressly attempted by the other. The same unjust preference, modified only in degree, is given to the carriages of the railway company. Their rivals are, to an apparent and substantial extent, deprived of a fair and equal opportunity in competition for business that is open alike to all persons wishing to engage therein.

The foregoing regulation will now be analyzed and considered without regard even to those facts relating to the size of the station and the location of its entrances and exits that were conceded on the argument, or assumed as matters of common knowledge of all residents of the city of Washington.

It appears that the train shed extends south along Sixth street and that trains enter from the south. The "station building" abuts on both Sixth and B streets.

On the Sixth street side all of the space from the corner of B street to the south line of the station building is set apart for hotel omnibuses. Next to that comes an uncertain and elastic space assigned to mail, express and baggage wagons. The remaining space along the lower or south end of the train shed is divided equally in amount between the hacks and vehicles of the railway company and those of others; but the north half, that nearest the passenger station, is awarded to those of the railway company exclusively.

The general public hacks and carriages are excluded from

the space adjacent to the passenger station and pushed down to the south end of the train shed to make room first for the mail, express and baggage wagons, and then for the hacks of the railway company. Evidence could scarcely make plainer the fact, that, on the Sixth street side, the general public hacks have been put at material disadvantage in the competition for passenger carriage.

Instead of compensating for this disadvantage on the B street front of the station building, which presents apparently the best location for hacks and carriages, it is aggravated by the disposition there made. One hundred and sixty linear feet have been assigned along that front (beginning at the western wall of the station building, thereby leaving its north front on B street unoccupied), of which the first one hundred feet are given to the exclusive use of the hacks and carriages of the railway company. Here, again, it requires no explanatory evidence to demonstrate the superior advantages of the location given to the railway company. The general public hacks and carriages are given a little more than one-third of the whole space, and that the most distant and inconvenient part. One single hack owner is given nearly two-thirds of the space, and that the nearest and most desirable.

There is nothing in the language of the act of Congress authorizing the Commissioners to establish stands at railway stations for hacks and carriages owned and operated by railway companies that indicates an intention to give the latter either a monopoly or an unfair and unjust preference.

All that reasonably can be inferred from that act is, that Congress intended to confer upon the railway companies a power that they could hardly have exercised otherwise, and to admit them to its exercise, at their own stations, upon terms of equality with all others similarly engaged.

I am not prepared to say, however, that the division of designated stands at railway stations into separate spaces

for the exclusive occupation of vehicles of the same kind and character of use, according to a classification determined alone by ownership, would be valid even if expressly authorized by Congress.

As said in *Curry* v. *Dist. of Col.*, the power of Congress to legislate for this District whilst exclusive is not unlimited or arbitrary.

Undoubtedly, the power to make classifications of persons and callings for the purposes of municipal regulation generally exists in the legislative department; but that classification must be founded on some reasonable distinction. It can not be arbitrary. "Arbitrary selection can never be justified by calling it classification." *G. C. & S. F. Rwy. Co.* v. *Ellis*, 165 U. S. 150, 159. The equal protection of the laws, to which all persons are entitled, forbids it. As was said by Mr. Justice Brewer, in the above case: "No language is more worthy of frequent and thoughtful consideration than those words of Mr. Justice Matthews, speaking for this court in *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369: 'When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power.' "

Now, the assignment of an exclusive and even favored location at railway stations for omnibuses—not alone those belonging to hotels, but to all licensed owners—might properly be made because of their peculiar character and the special advantages they offer to unattended women and children who may need special protection.

Undoubtedly, also, there could be reserved a convenient space at or near the places for the receipt and delivery of mails, baggage and express freight, and for the necessary wagons engaged in handling the same.

And so, likewise, a special and even favored reservation

might be made for the hacks and carriages of railway companies, at their own stations, if Congress, instead of merely permitting should require them to provide the same, at all times, for the further carriage of their passengers to places throughout the city. Failure to perform this duty would subject to liability, and hence its imposition might with reason be attended with a preference over others who, though engaged in the same business, are under no obligation to prosecute it save at their own wills.

A railway company has no special easement of the kind in a public street because the station abuts thereon, and mere permission to engage in this additional carriage of passengers can not justify its preference therein over others similarly engaged, whether special incorporations for the purpose, or individuals with license. Hence there can exist no reasonable ground for its classification apart from them as a foundation for the grant of special privileges.

I believe that the judgment of the police court was right and that it ought to be affirmed.

For these reasons I am constrained to dissent from the opinion and judgment of the court.