STANDARD COMPUTING SCALE CO., Limited, v. FARRELL, State Superintendent of Weights and Measures.

(District Court, S. D. New York.  January 8, 1916.)

COMMERCE ⊜57—CONSTITUTIONAL LAW ⊜207(2), 296(2)—WEIGHTS AND MEASURES ⊜2—STATE REGULATION—CONSTITUTIONALITY.

A rule promulgated by the superintendent of weights and measures of New York that all combination spring and lever computing scales must be equipped with a device which automatically compensates for changes in temperature, is not in violation of the constitutional rights of a nonresident manufacturer of scales which have no such automatic compensating device, and, assuming it to be authorized by the statutes of the state, its enforcement may not be enjoined by a federal court.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 72–76, 88, 90, 92–102; Constitutional Law, Cent. Dig. §§ 629–632, 825–829, 838; Weights and Measures, Cent. Dig. § 2.]

In Equity.  Suit by the Standard Computing Scale Company, Limited, against John F. Farrell, as State Superintendent of Weights and Measures of the State of New York.  Bill dismissed.

Herbert C. Smith, of Brooklyn, N. Y., for complainant.

The Attorney General of New York (Edward G. Griffin, Deputy Atty. Gen.), for defendant.

HOUGH, District Judge.  Mr. Farrell, in his capacity as superintendent of weights and measures of this state, has promulgated the following rule:

"Automatic Computing Scales.

"All combination spring and lever computing scales must be equipped with a device which will automatically compensate for changes of temperature at zero balance, and throughout the whole range of weight gradations."

The scale referred to is "spring," because the load of the article to be weighed stretches an elastic (usually a helical) coil of steel, which in turn operates an indicator that comes to rest over figures indicative of weight; it is "lever," because the spring is directly affected by a lever on which the thing weighed proximately operates; it is "combination," because the spring and lever are united in the mechanism; and it is "computing," because the indicator apparatus is so arranged that, within the limits of weights and prices for which it is contrived, one glance at a printed card, which is part thereof, shows, e. g., not only that the customer has obtained 9½ pounds of something, but what he owes for it at 8 cents a pound.

In any contrivance which depends for efficiency upon the elasticity of metal, there is an element of error introduced by changes of temperature.  In such an apparatus as the scale under consideration a popular description of such capacity for error is to say that the spring "stiffens up" in cold weather and relaxes or loosens in warm weather.  When a computing scale ultimately depends for its proper function upon such a spring, it is obvious that an erroneous weight produces an increasingly erroneous price, as the amount bought becomes greater.  Even if the percentage of error for all weights within the capacity

of the scale remains constant (which is not always the case), most springs will stretch more in proportion for the first few pounds of weight applied to them than for the last pounds for which they are designed. From this it follows that (for example), if a computing scale be designed for weights up to 40 pounds and prices up to $1 a pound, the lines on the indicator chart will grow closer together as the limit of weight or price, or both, is approached. Therefore, even with a constant percentage of error through the whole range of operations, the proportionate amount of indicated untruth may grow greater as the weight increases. There are many other reasons why a spring scale, or any other scale, may develop inaccuracy, besides changes of temperature. Upon them it is unnecessary to dwell. There is such a thing as automatic compensation for error induced by temperature variations. The only compensating method shown to the court is covered by a patent and owned by a scale manufacturing company. It functions by using the different rate of contraction or expansion of different metals to produce less or more tension upon the weighing spring as the condition of the thermometer may require; the scale being balanced and adjusted at a given temperature with the compensating metals in known positions.

So far as shown, this method of compensation is accurate, but slow; that is to say, it will take perhaps some hours to get a scale, which has gone wrong through a drop in the temperature of say 30 degrees, to again become accurate. But it is impossible to prevent the operation of this automatic corrector, except by such crude devices as inserting a bar or stick in the scale to prevent its operating at all.

The complainant has no automatic compensation upon its scale, but it has a mechanical compensator. The fact that the scale is no longer true is shown by an examination of the indicator card. If that error is caused by expansion or relaxation of the spring, it can be corrected by increasing or diminishing the tension upon that spring, by turning a screw. This correction can be made instantly, and in the hands of an honest and even reasonably intelligent owner I see no reason why complainant's scale is not as good, and more easily corrected, than a machine containing an automatic device of the kind above roughly described.

But it is also proven to be true that the same mechanical device with which an honest man will correct complainant's scale for variations caused by temperature can be easily used by a dishonest, or perhaps even an ignorant, owner to apparently correct inaccuracies of the scale which have no relation whatever to atmospheric change. The same turn of the same screw which properly produces correspondence between two marks on the indicator face after a sudden drop or rise of temperature will also produce an apparent correctness when the temperature has remained constant, but (for example) the spring has suddenly and permanently weakened.

It is therefore true (and this is found to be the basis or reason for defendant's action) that a spring scale without automatic compensation for atmospheric changes is more easily and with less likelihood of detection manipulated against a customer than is a similar scale with automatic protection.

The theory of this bill is simple, and single, viz.: That the superintendent's rule as above quoted is an invalid (i. e., unconstitutional) attempted exercise of the police power, in that it unjustly discriminates between the complainant's scale and the scales of other manufacturers. Section 10, art. 1, Constitution U. S. It is alleged also to violate the Fourteenth Amendment of said Constitution, and to interfere with interstate commerce. The prayer of the bill puts in a considerable variety of ways the demand that defendant cease to interfere with or prevent "county sealers" from bestowing approbation upon complainant's scales.

What has actually happened is this: There is a considerable body of statute law in New York relating to weights and measures. By that law the offices of county and city "sealers" are established. These officials are not appointed by the defendant, nor removable by him. They are charged with the duty (inter alia) of examining weights and measures within their cities or counties at stated intervals, and when the same are found to correspond with the state standards the sealers "shall seal and mark such weights and measures with the appropriate devices." General Business Law, art. 2, § 15, as amended in 1910 (Laws 1910, c. 187).

It is not obligatory upon the defendant to seal anything, though he must at least once in two years visit the various cities and counties of the state (either personally or by deputy) and inspect the work of the local sealers, and in the performance of this duty of inspection "he may inspect the weights, measures, balances or any other weighing or measuring appliances of any person, firm or corporation." Section 11. But no where in the statutes is there to be found any specific authorization conferred upon the state superintendent permitting him to give definite and detailed instructions to city and county sealers as to what particular form of weighing or measuring device they shall approve or shall disapprove.

It is proven (human nature being what it is) that the official seal placed by local sealers upon this or that weighing or measuring apparatus is looked upon with great respect by the purchasing community, whether that phrase means the persons who buy scales or those who buy what is weighed. It is a very serious handicap upon, if not almost a complete prohibition of, successful selling of any given scale in the state of New York, that it cannot obtain the approval of the local sealers.

Not all of the city and county officials have recognized the validity of the rule first above quoted, but most of them have done so, and they now refuse to seal any spring and lever computing scale that has not an automatic compensation for changes of temperature. This has become known, plaintiff's sales have fallen off, persons who bought scales on the installment plan are refusing to pay, and I think it is proven that what was prior to the promulgation of this rule a fair market for plaintiff's scales in this state has ceased to exist. The object of this suit is by some form of injunctive relief to correct or abolish the rule which has caused this business catastrophe.

Plaintiff is a citizen of Michigan, but at bar jurisdiction was not grounded upon diversity of citizenship, nor does the bill anywhere al-

lege that the amount in controversy "exceeds the sum or value of $3,000, exclusive of interest and costs." However unusual the foregoing facts may be, and however harsh is the rule which has apparently excluded from the most populous state of the Union one class of scale manufacturers in favor of another class, I do not perceive that this cause involves any new or uncommon question of constitutional law.

Unconstitutionality is usually tested by an examination of the language of a statute, but sometimes (even if that language be unexceptional) the action or practical application thereof may give rise to an unconstitutionality not inherent in the law, but arising from the unjust and extravagant application thereof by the human beings charged with its reasonable enforcement. Of this the best example is Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220.

It is here assumed (even by plaintiff) that the statutes of New York regulating weights and measures and creating and limiting defendant's office are fair upon their face. Let it be assumed (for the purpose of present argument) that these statutes authorize the rule in question. Making such assumption, the question is presented whether the regulation infringes upon any of the constitutional rights of any person.

It is said that the business of making and selling scales is an honest and lawful business. So it is generally speaking; but it is not true that, where a subject (as is the case in respect of weights and measures) is historically and essentially subject to government regulation, and indeed is one entirely created by governmental authority, that any particular style of scale, weight, or other instrument of mensuration is entitled either to governmental approbation or to be sold or used at all within the area of that government's sovereignty. It may be that the present generation will see an adoption by this country of the metric system. If that were accomplished by legislation, it is not doubted that the sale or use of any weight or measure not conformed to the metric system might be pronounced unlawful.

But, even if no attention be paid to the peculiar nature of weights and measures in their relation to statute law, it is still true that the Legislature may classify those things which it approves and recommends to the citizen and those which it does not; and if such classification is honest, and honestly enforced, without personal malice against any particular citizen or class of citizens, the judges may disagree with the expressed wisdom of the Legislature, but the courts are without power to interfere. The question is political, and not judicial.

Therefore, upon the assumption that the rule complained of is authorized by legislation, the final inquiry becomes this: Do the facts here shown furnish any reasonable ground for such a classification of scales as is shown by the rule? In my judgment such reasonable ground is found. It is at least a matter for debate, a question upon which the opinions of equally competent and fair-minded men may differ, as to whether the inherent nature of computing scales is such that automatic compensation should be made a vital test of approval.

It surely needs no citation of authority to prove that, where a discretion is lawfully vested in and honestly exercised by a duly appointed official, for the courts to interfere therewith is to substitute

their own discretion or opinion for that of the officer in whom the same was (in contemplation of law) vested by the electorate or executive appointing power. It results that (upon the assumption hitherto made) no unconstitutionality is shown in the rule, and the bill should therefore be dismissed.

Whether the action of any given official is unconstitutional is an entirely different question from the query whether it is illegal. As above set forth, I am clearly of opinion that what Mr. Farrell has done is constitutional, on the assumption that it is legal; i. e., warranted by the statutes of this state. Whether it is legal—that is, whether there can be found any statutory authority for the exercise of power that Mr. Farrell has assumed—is in my opinion a very doubtful question. Indeed, if I were asked to interpret as new matter and without the aid of authority the statutes of New York relating to weights and measures and the office of superintendent thereof, I should strongly incline to the opinion that neither the superintendent nor the county sealers were authorized to do anything more in respect of scales of any kind than to ascertain whether or not they weighed falsely at the moment of inspection, and if they did weigh false to institute a prosecution and seize the scale as a preliminary thereto, while, if they weighed truly when inspected, the sealers should signify that fact by an appropriate certificate, even if the very man who gave the certificate might be morally convinced that the scale would and could be willfully falsified the moment his back was turned.

It thus appears that the facts of the case raise this question, viz., whether in this court at the suit of a citizen of Michigan, an official of the state of New York can be restrained in respect of an exercise of power not inherently wrong nor opposed to any section of the federal Constitution, but unwarranted by the statutes of the state. However interesting and curious this point may be, it is thought not to be actually raised in this instance, because: (1) The bill does not ask for any such relief; (2) nor does it show facts necessary to ground jurisdiction on diversity of citizenship; (3) the view of the state statutes above indicated is opposed to the opinion of the Attorney General of the state which is pleaded by plaintiff as a correct exposition of the law; (4) without being bound by the opinion of the Attorney General (as this court would be by the views of the Court of Appeals) it is entitled to great respect and should not be departed from lightly, nor at all under pleadings such as these; and (5) if it be true (as I incline to think) that Mr. Farrell's action is unwarranted by statute, then he has no discretion, his act is an erroneous ministerial piece of conduct, and the remedy is mandamus and not injunction. Injunction is all this bill asks for; and (6) mandamus can issue out of the courts of the United States only as ancillary to a jurisdiction already existing; "in other words, the writ cannot be used to confer a jurisdiction which the (federal) court would not have without it." Bath County v. Amy, 13 Wall. 249, 20 L. Ed. 539; Rosenbaum v. Bauer, 120 U. S. 455, 7 Sup. Ct. 633, 30 L. Ed. 743.

It follows from these views that the bill must be dismissed.