**POON v. MILLER et ux. (No. 6609.)**

(Court of Civil Appeals of Texas. San Antonio. Nov. 2, 1921.)

**I. Pleading ⊜251—Abandoned pleadings not to be consulted to supply deficiencies of amended ones.**

Amended pleadings must be sufficient in themselves, and abandoned pleadings cannot be consulted to supply deficiencies in the amendment.

**2. Fish ⊜8—Capture and sale of fish from state's public waters may be regulated.**

Vernon's Sayles' Ann. Civ. St. 1914, art. 3980, providing that all public waters within the state shall remain the property of the state, except so far as their use shall be permitted by the laws of the state, is declaratory of the state's sovereignty, Texas having come into the Union as an independent republic, and the state has not only the authority to regulate its fishing, but to regulate the sale of fish when taken.

**3. Constitutional law ⊜210 — Fish ⊜9— Treaties ⊜11—Requiring citizenship qualification for wholesale license for selling fish in conflict with treaty and United States Constitution.**

Vernon's Sayles' Ann. Civ. St. 1914, art. 3987, so far as it denies to an alien a license to engage in business as a wholesale dealer in fish, and Pen. Code 1911, art. 917, making it a crime to be a wholesale dealer in fish without having procured a license, by reason of Const. U. S. art. 6, declaring the supreme law of the land, are invalid as in conflict with the treaty of November 17, 1880 (22 Stat. 827) between China and the United States, giving to Chinese in the United States all the rights of citizens of the most favored countries, and Const. U. S. amend. 14, granting to any person within the jurisdiction the equal protection of the law.

**4. Contracts ⊜117(3)—Seller's contract not to compete in same kind of business in the county not invalid.**

A contract for the sale of a fish market, with provision that the seller shall not engage in the business in the county during the time the buyer is so engaged, is not in restraint of trade.

Appeal from District Court, Bexar County; S. G. Tayloe, Judge.

Action by N. M. Poon against J. F. Miller and wife. Judgment for defendants on directed verdict, and plaintiff appeals. Reversed and remanded.

Templeton, Brooks, Napier & Brown, of San Antonio, for appellant.

W. C. Linden, of San Antonio, for appellees.

FLY, C. J. This is a suit by appellant against appellees to recover $10,000 from them and to enjoin them from operating a fish and poultry business as long as appellant, his heirs, and assigns operate the Morgan Fish & Poultry Company business, purchased by appellant from appellees under a contract that bound appellees "not to operate or work in, or to have any interest in or connection with, any fish and poultry business in the city of San Antonio, Bexar county, Tex." It was alleged that appellees had breached the contract and gone into the fish and poul-

---

try business in San Antonio. The court instructed the jury that appellant could not, under the law, recover, and to return a verdict for appellees, which was done, and judgment rendered accordingly.

[1] This case was tried upon a first amended petition, a supplemental petition, and three trial amendments by appellant and an amended answer and four supplemental answers by appellees, and in all of these pleadings the names of the parties are not revealed. The original petition is not contained in the record, and we have no information as to J. F. Miller being the husband of his codefendant, whatever her name may be, except through the abbreviated description of her in the style of the case as "et ux." We have possibly ascertained the names of all the parties by consulting the judgment of the court and the appeal bond. Amended pleadings must be sufficient in themselves, and abandoned pleadings cannot be consulted to supply deficiencies in the amendment. We have considered the pleadings in this case, because no point is raised as to them, but have deemed it proper to call attention to the defects which might, under certain circumstances, be fatal to the cause of action.

The appellant herein is a Chinaman, who has lived in the United States 15 years and in Texas seven years, but has not been naturalized. On September 5, 1919, appellant bought from appellees, for a consideration of $5,000, a certain lease from the city of San Antonio to space in the city market house, held in the name of the Morgan City Fish & Poultry Company, together with the entire business of said company and its good will, and appellees agreed to aid appellant in holding the customers and patrons of the company, and appellees bound themselves, "as part of this contract, not to own, operate, or work in, or to have interest or connection with, any fish or poultry business in the city of San Antonio, Bexar county, Tex." Appellant paid for the business; but appellees paid no attention to their contract, but in less than a week had formed a scheme to open a fish and poultry market just across the street from the place were appellant was doing business, and soon enticed his customers and business from him. Of course, subterfuges were used and masked transactions were entered into to hide their tracks, but the evidence showed that the business called the St. Louis Fish & Produce Company belonged to and was conducted by appellees. Appellant was refused a license to sell fish and poultry because he was an alien, but a license was granted for the business to a niece of his, who was a citizen of Texas.

[2] The state of Texas declares, through article 3980, Vernon's Sayles' Statutes, that—

"All of the public rivers, bayous, lagoons, lakes, bays and inlets in this state and all that part of the Gulf of Mexico within the jurisdiction of this state, together with their beds and bottoms, and all the products thereof, shall be, continue and remain the property of the state, of Texas, except so far as their use shall be permitted by the laws of this state."

Texas, since the yoke of Mexico was thrown off in 1836 and she became an independent government, has never for one moment lost the sovereignty over her lakes, rivers, bayous, lagoons, bays, and inlets and the bed of the Gulf of Mexico for three miles from the coast from the mouth of the Sabine river to the mouth of the Rio Grande. By treaty Texas entered into the American Union, after having been an independent government for nearly 10 years, and the property she had in her rivers, bayous, lagoons, lakes, bays, and inlets and the three-mile Gulf zone, as well as all her public lands, were reserved and retained by the terms of her treaty with the United States. The statute quoted is merely a declaration of rights that required no statute to give them force and vitality. The fish and game are the property of the state, and she not only has the power to regulate and control the taking of fish and killing of game, but to absolutely prohibit the same. Sterrett v. Gibson (Tex. Civ. App.) 168 S. W. 16. That proposition is no longer open for discussion, nor is the further proposition that the state has not only the authority to regulate or prohibit the capture of fish or slaughter of game, but has the authority to absolutely regulate or prohibit the sale of such game or fish when killed or taken. It does prohibit the sale of game and does regulate the sale of fish, oysters, and other products of streams, bays, lakes, and estuaries.

[3] It is not questioned that the state can regulate the sale of fish and prescribe certain rules in order to engage in the business of selling fish, and no part of article 3987, Vernon's Sayles' Statutes, which provides rules for the government of wholesale dealers in fish and oysters, is assailed, except that requirement that as a condition precedent to obtaining a license to engage in such business the applicant may be required to swear that he is a citizen of the United States by birth, or not being so shall state that he has been granted full naturalization papers and by what court and at what time they were granted. This provision is supported by a statute making it a crime for any one to engage in the business of a wholesale dealer in fish and oysters without procuring a license. Penal Code, art. 917. The two statutes are assailed as being unconstitutional because in conflict with the Fourteenth Amendment to the Constitution of the United States, and in this case in antagonism with a provision of a treaty between the United States and China (22 Stat. 827), wherein it is provided:

"Chinese subjects, whether proceeding to the United States as teachers, students, merchants

or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States, shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nations.

"If Chinese laborers, or Chinese of any other class, now either permanently or temporarily residing in the territory of the United States, meet with ill treatment at the hands of any other persons, the government of the United States will exert all its power to devise measures for their protection and to secure to them the same rights, privileges, immunities, and exemptions as may be enjoyed by the citizens or subjects of the most favored nations, and to which they are entitled by treaty."

Defining and construing the last article copied of the treaty, in a later convention between the United States of America and the Chinese Empire, it was agreed:

"In pursuance of article III of the immigration treaty between the United States and China, signed at Peking on the 17th day of November, 1880 (the 15th day of the tenth month of Kwanghsu, sixth year), it is hereby understood and agreed that Chinese laborers or Chinese of any other class, either permanently or temporarily residing in the United States, shall have for the protection of their persons and property all rights that are given by the laws of the United States to citizens of the most favored nation, excepting the right to become naturalized citizens. And the government of the United States reaffirms its obligation, as stated in said article III, to exert all its power to secure protection to the persons and property of all Chinese subjects in the United States." U. S. Comp. St. 1901, § 2164, p. 1326.

It is not denied by appellees that under treaties with other nations their citizens are authorized "to carry on trade, wholesale and retail, in the United States," and "generally to do anything incident to or necessary for trade upon the same terms as the natives of the country, submitting themselves to the laws then established." It is so provided in the treaty with Italy and other favored nations, and undoubtedly the privileges therein granted are extended to and guaranteed to the citizens of China in this country. That consequence inevitably follows, and the question then presented is, Can a state pass laws which discriminate against the natives of countries who have been by treaty given the right to trade in the United States "upon the same terms as the natives of the country," and which guarantees to such aliens "the same rights and privileges as are or shall be granted to the natives"? Fed. Stats. Ann. vol. 7, p. 656. So far as the wholesale fish business is concerned in Texas, if that part of article 3987 which in effect prohibits any alien from engaging in the wholesale fish business is upheld, the treaties giving the right to aliens to engage in trade as do the natives are nugatory and vain, and are virtually abrogated.

Not only is no such power or authority lodged in the Legislatures of the different states, but in article 6 of the Constitution it is clearly and unequivocally declared:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

Treaties made by the federal government are thus given the sacredness, dignity, and force of the Constitution, and judges in every state in terms are commanded to be bound by them. In the face of that imperative provision of the supreme law of our land, it is useless to argue that the state of Texas owns all her fish and has the power and authority to enact any rules and regulations she deems necessary to safeguard the interests of her citizens in such fish. Undoubtedly, the state could prohibit the sale of fish if it was deemed proper so to do; she can make rules and regulations for the sale or shipment of fish, but those rules and regulations cannot antagonize and be given higher dignity and power than the Constitution of the United States. Texas, when she voluntarily entered by treaty into the Union of American states, did not and could not reserve the right to disregard the Constitution of the United States. She entered the Union as no other state ever entered it since the adoption of the federal Constitution, but entered under the provisions of that Constitution, bound by the same allegiance thereto which is owed by any other state. In any state laws might be enacted and enforced against the killing or taking of its game or fish by any person except citizens of the state, for it has the property in the game and fish and can well restrict the right to appropriate them to its citizens. However, when the game and fish have been appropriated and passed out into the avenues of business and trade, a different proposition is confronted. The difference has been recognized by the Supreme Court of the United States.

In the case of McCready v. Virginia, 94 U. S. 391, 24 L. Ed. 248, it was held that each state owns the beds of all tidewaters within its jurisdiction; that they own the tidewaters, also the fish running therein; and that the property in such fish could be confined to the citizens of the state. The court said:

"The right which the people of the state thus acquire comes, not from their citizenship alone, but from their citizenship and property combined. It is, in fact, a property right, and not a mere privilege or immunity of citizenship."

It was held in that case that Virginia could confine the right to plant oysters in the

bays of the state to its citizens. The treaty with China could have no reference to the taking of fish, for it was evidently entered into to preserve and protect the right "to anything incident to or necessary for trade upon the same terms as the natives of the country."

There are in the statutes nothing forbidding the sale of captured fish by those taking them, and, by reason of there being no such provision, the absolute property in the fish passes to the individual who captures them, and he can sell or dispose of them as he may see proper, except in so far as such disposition or sale is regulated by law. The only regulation as to the sale of fish applies to wholesale dealers. The wholesale dealer in fish or oysters usually obtains possession of them by purchase from those who have captured them and to whom they absolutely belong. In other words, when lawfully captured, the fish become the property of the capturer, and he can place them in the avenues of trade as he may desire as a retailer. Whenever the state has absolutely parted with the ownership of its fish, and they have gone into commerce, the state may require a license to sell them as a wholesale dealer, but it cannot, in violation of a treaty of the federal government, prohibit any one, alien or citizen, from selling the fish. The state may have the power to regulate the sale of property belonging to the citizen or resident which has become a part of the commerce of the country, but cannot absolutely prohibit such sale, in the face of the federal Constitution, by an alien who has the same rights guaranteed to him as has the citizen.

It has been held that, under the provisions of the Fourteenth Amendment to the Constitution, which provides that no state shall "deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law," laws similar to the Texas statute were unconstitutional. Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; State v. Montgomery, 94 Me. 192, 47 Atl. 165, 80 Am. St. Rep. 386.

In the last-cited case a law had been enacted which confined the granting of licenses to peddle to citizens of the United States, and the Supreme Judicial Court of Maine held that such law was repugnant to the provisions of the Fourteenth Amendment to the federal Constitution, and that to deprive a man of the right to select and follow any lawful occupation is to deprive him of both liberty and property within the meaning of the Fourteenth Amendment.

Again in the case of Templar v. Board of Examiners, 131 Mich. 254, 90 N. W. 1058, 100 Am. St. Rep. 610, a statute denied the right to a certificate as a licensed barber to any

alien, and the Supreme Court of Michigan held that the law was unconstitutional under the provisions of the Fourteenth Amendment.

The distinction between the right to provide that none but citizens can take fish and oysters from the waters of the state and the right to sell the same after they become private property is drawn by the Supreme Court of Florida in Ex parte Gilletti, 70 Fla. 442, 70 South. 446. In that case a law requiring an alien to obtain a license to take oysters in the waters of the state was sustained; the court holding:

"The equal right of all persons who reside in a state, whether citizens or aliens, to labor therein does not include an equal right of an alien to participate in the common property and privileges that are peculiar to citizens. The statute does not purport to discriminate against aliens and nonresidents with reference to private property rights or the right to labor or to deal in fish and oysters after they lawfully become private property."

We conclude that the provision of the statute denying this right to an alien to whom has been given all the rights of citizens of most favored countries is in conflict with the treaty between the United States and China, and also is obnoxious to the provisions of the Fourteenth Amendment to the Constitution, and is of no force and effect. The provision as to aliens selling fish, however, in no way affects the validity and constitutionality of any other provision of the statute, and this decision will be confined strictly to that part of the statute which denies to an alien a license to engage in business as a wholesale dealer in fish.

The evidence was sufficient to take the case to the jury, and the court erred in peremptorily instructing a verdict for appellees. The evidence objected to by appellant, which was drawn from him by appellees, was improperly admitted and should not have been permitted. The fact that appellant may have sought to obtain a license to sell in a circuitous manner had no proper bearing on the case, and did not tend to relieve appellees from damages incurred through their utter disregard for, and inexcusable breach of, a contract. The fifteenth, sixteenth, seventeenth, and eighteenth assignments of error are sustained.

[4] The contract between the parties was not in restraint of trade, and is subject to enforcement. Welsh v. Morris, 81 Tex. 159, 16 S. W. 744, 26 Am. St. Rep. 801; Raymond v. Yarrington, 96 Tex. 443, 72 S. W. 580, 73 S. W. 800, 62 L. R. A. 962, 97 Am. St. Rep. 914; Malakoff Gin Co. v. Riddlesperger, 108 Tex. 273, 192 S. W. 530; Schlag v. Johnson (Tex. Civ. App.) 208 S. W. 369.

The judgment will be reversed, and the cause remanded.