PEOPLE OF PORTO RICO, Plaintiff and Appellee, *v.* PASCUAL RAMOS, Defendant and Appellant.

No. 2933.   Argued March 23, 1927.—Decided May 25, 1927.

*C. Domínguez Rubio, Adolfo Porrata Doria* and *Pedro Anglade* for the appellant.   *José E. Figueras* for the appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

This is a case of murder. The defendant was convicted and sentenced to suffer the death penalty. He now appeals from that judgment and moves for a new trial on grounds which we shall examine in the order of their presentation.

The first question raised occurred at the commencement of the trial. The defendant moved to quash the information because he had not been indicted by a grand jury. The motion was opposed by the district attorney and overruled by the court.

The defendant is not invoking here his right of intervention by a grand jury on constitutional grounds. This question has been decided repeatedly and would have no support whatever.

What the defendant alleges is—

1. That the Legislature of Porto Rico enacted in 1919 an Act establishing the grand jury, the first section thereof reading as follows:

"That all felonies shall be prosecuted by indictment of the Grand Jury, filed in the court having jurisdiction of the case.

"All other crimes may be prosecuted as determined by the Code of Criminal Procedure."

2. That that Act is in force and requires that he be indicted by a grand jury, the offense being a felony, because the law that was applied in denying him that right was unconstitutional and therefore void, as it was in conflict with section 2 of the Organic Act in so far as it denies him the equal protection of the laws.

The appellant refers to Act No. 98 of 1925. It has only two sections which read as follows:

"Section 1.—That section 1 of Act No. 58 of June 18, 1919, entitled 'An Act establishing the Grand Jury and regulating the proceedings thereof, determining the form of indictments by the Grand Jury, the presentation and reading of the same, and the proceedings

subsequent to the presentation' are hereby amended so as to read as follows:

" 'Section 1.—Any felony charged against a public officer by reason of acts done by him in the performance of his duties, shall be prosecuted by indictment of the Grand Jury filed in the court having jurisdiction in the case.

" 'All other crimes shall be prosecuted as determined by the Code of Criminal Procedure.' "

Had the Legislature authority to enact such a law? Does it deny the equal protection guaranteed by the Organic Act of Porto Rico and by the Constitution of the United States?

In support of the alleged nullity of the Act the appellant invokes the doctrine which appears in 12 Corpus Juris, 1186. It is as follows:

"A statute relating to criminal procedure is void as a denial of the equal protection of the laws if it prescribes a different procedure in the case of persons in like situation."

The text of Corpus Juris rests on the case of *State* v. *Holland*, 37 Mont. 393.

In that case the following statute was declared void as opposed to the constitutional precept on the right to the equal protection of the laws:

" 'Sec. 1192. Any person who willfully wears the badge of the Grand Army of the Republic, the insignia, badge or rosette of the Military Order of the Loyal Legion of the United States, or of the Military Order of Foreign Wars of the United States, or the badge or button of the United Spanish War Veterans, or the Order of Patrons of Husbandry, or the Benevolent and Protective Order of Elks of the United States of America, or the Order of the Knights of Pythias, or Labor Organizations, or any society, order or organization of ten years' standing in the state of Montana, or uses the name to obtain aid or assistance within this state, or willfully uses the name of such society, order or organization, the title of its officers, or its insignia, rituals or ceremonials, unless entitled to use or wear the same under the constitution and by-laws, rules and regulations of such order, or of such society, order or organization, shall be guilty of a misdemeanor, and, upon conviction, shall be punished by imprisonment for a term not to exceed ninety days in the county

jail, or a fine not to exceed two hundred and no–100 ($200.00) dollars, or by both such fine and imprisonment, provided this shall not apply to the wives, daughters, sisters or mothers of members of those orders who are in good standing.' "

The reasoning of the court was as follows:

"Another contention is that the law is void for the reason that it makes an arbitrary classification of citizens who occupy exactly the same relation to the subject-matter with which it deals, and is therefore obnoxious to the Fourteenth Amendment to the federal Constitution. This contention, we think, must also be sustained. The proviso makes an exception of the wives, daughters, sisters and mothers of members of any of these societies in good standing. Why should this exception be made? The only answer is that it was for purely sentimental reasons influencing the legislative mind, based upon the notion that women who have certain legal and blood relationship to the members occupy a different legal relation to the subject of legislation. 'By the phrase "equal protection of the laws," is meant equal security under them to everyone, under similar terms, in his life, his liberty, his property, and in the pursuit of happiness, and exemption from any greater burdens and charges than such as are equally imposed upon all others under like circumstances. Hence a statute bearing alike upon all individuals of each class or on all districts in like conditions with uniformity does not deny the equal protection of the laws, but such classification must not be arbitrary and without reasonable grounds on which it may be based.' (8 Cyc. 1059). *E converso*, if a particular statute distributes its burdens unequally upon those who occupy the same relation to its subject, if it punishes one citizen for doing that which another may do with impunity, if it abridges the liberty of one without imposing a like restriction upon .another, it does not furnish the 'equal protection of the laws', or the protection of equal laws, which is guaranteed by the amendment. 'The equal protection of the laws is a pledge of the protection of equal laws.' (*Yick Wo* v. *Hopkins*, 118 U.S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220).

"In *State* v. *Cudahy Packing Co.*, 33 Mont. 179, 114 Am. St. Rep. 804, 82 Pac. 833, it was held by this court that a statute prohibiting the formation of combinations or trusts for the purpose of controlling the prices of products or destroying competition, which excepted from its operation persons engaged in horticulture or agriculture, was void for the reason that it bore unequally upon different

persons in the community engaged in the same or similar pursuits. On principle, that case cannot be distinguished from this.'' *State* v. *Holland*, 37 Mont. 406-7.

Then Corpus Juris sums up the jurisprudence of the different states, as follows:

''Subject to this limitation, however, the legislature has a large measure of discretion in prescribing the modes of criminal procedure, and in adopting particular methods of procedure to particular classes of cases; and no denial of the equal protection of the laws can result from a trial in accordance with valid rules of procedure thus established. Thus no denial of the equal protection of the laws is effected by statutes which allow a person to be prosecuted in the discretion of the prosecuting attorney for one or another of two offenses committed by the same act, or by a statute which as to offenses thereafter committed lengthens the period within which prosecution may be had, or prescribes different methods of procedure in different parts of the state, or authorizes an arrest without a warrant for certain offenses, or allows an information to be filed with leave of court without preliminary examination, or prescribes a particular form of indictment for a particular offense, or by statutes which prescribe different methods of drawing juries in different cases, or in different parts of the state, or prescribe the number of peremptory challenges of jurors allowed in different cases, or different numbers of such challenges in places of different sizes, the grounds of such challenges, or the time within which they may be made, or by an act providing that certain errors shall not be ground for reversal, or allowing a new trial on motion of a convicted defendant, or granting different rights of appeal from different courts and in different classes of cases, or changing the personnel of an appellate court after appeal; nor does the failure of the law to provide a method for compelling the attendance of defendant's witnesses who are without the state, or to provide a method for taking and using the depositions of such witnesses, constitute a denial by the state of the equal protection of the laws. So the legislature may make proof of one fact prima facie evidence of another fact to the extent that there is some rational connection between the fact proved and the fact presumed. A juror put on defendant and peremptorily challenged may be again put on defendant at a subsequent trial under the same indictment without depriving him of the equal protection of the laws. But any action by the officers charged with the selection of a jury which constitutes

a discrimination against persons belonging to the same political party as the accused constitutes a violation of the equal protection guaranty.'' 12 C. J. 1186–87.

As may be seen, no case similar to ours is to be found.

We have consulted Cooley's Constitutional Limitations and have not found anything directly bearing on the specific question raised.

We have also consulted Black's Constitutional Law in which several pages are devoted to an examination of the constitutional guaranty on the equal protection of the laws, citing a great number of cases. It begins by saying that ''the clause does not mean to confer new rights but simply prohibits certain class of action or legislation on the part of the states. It means that no person or class of persons shall be denied the equal protection of the laws which is enjoyed by other persons or class of persons similarly situated, its object being to prevent arbitrary and individual discrimination and class legislation not founded on a legal and reasonable base of discrimination.'' And later it adds: ''The Fourteenth Amendment does not require that all persons should have the same right to a hearing or trial before the same court and be invested with the same right of appeal; and a law which bears similarly on all persons under the same circumstances, in those respects, complies with the requirements of the constitution.''

The text enunciates principles that may guide us in solving the problem, but the facts of the cases cited in support thereof present different situations.

As far as we have been able to study the jurisprudence, we have not found a case similar to ours. We must give, therefore, our serious consideration to the problem and decide it ourselves in accordance with the letter and spirit of the constitutional guaranty and the general principles established in connection therewith.

Let us go back to the citation by the appellant of 12 Corpus Juris, 1186, and the case of *State* v. *Holland, supra.*

There is no doubt that Act No. 98 of 1925 would be void if it provided a different procedure for persons similarly situated.

That act establishes in effect a different procedure for offenses committed by public officers in the performance of their duties and those committed by private citizens, but are such persons in the same situation?

We think not. If the Legislature had provided a different method of procedure for public officers when committing any common offense, we would grant that an illegal privilege had been bestowed on public officers, but the discrimination established is rather between offenses than between persons, and in such case it does not constitute class legislation, is not in conflict with the Organic Act or the Constitution and therefore is valid.

It must be borne in mind that in order to arrive at this conclusion we have started from the fact that the right to a grand jury is not fundamental and may be granted or refused, in a general way, of course, by the Legislature in the exercise of its regular powers.

Besides, what the Legislature did in the Act in question was in reality to suppress the grand jury with certain exceptions, and if these exceptions were held to be void as unconstitutional, it would result that the institution of the grand jury would not work for all and therefore the defendant would not have any right.

The second question raised refers to the evidence. This is what occurred:

The prosecution rested its case. The defense began the introduction of its evidence by calling Manuel Barrios as a witness, who testified:

"That his name is Manuel Barrios; that he is a policeman; that about the time when the act was committed he was stationed in Guayama; that about that time he, in company with chief Quiñones, arrested Pascual Ramos; that he arrested him in the territory of Central Lafayete near the town of Arroyo; that he had a wound

on the right side of his neck; that he talked with the defendant on their way to Guayama; that Pascual Ramos told him in the course . . . . At that time the prosecution made the following statement:

"District Attorney:—I object now. That evidence may be introduced by the prosecution but not by the defense; I could not bring in the defendant as a witness; the defense can call him as a witness. That is hearsay evidence.

"Attorney Anglade:—We have questioned the policeman on those particulars because they are facts co-existing with the deed; they are facts which fall within the *res gestae.*

"Judge:—The objection is sustained.

"Attorney Anglade:—We respectfully take exception to the ruling of the court.

"The witness went on testifying:—That Pascual Ramos had a wound on the right side of his neck; that he was not bleeding at the moment of the arrest; that that wound had been inflicted about one or two hours previously; that he could not make an accurate guess; that the defendant's undershirt was stained with blood; that he wore a coat, trousers and undershirt; that he arrested him about 2 p. m.

"Questioned by the jury:—That when he arrested the defendant the latter was carrying a machete which was stained with blood.

"Cross-examined by the defense he went on testifying:—

"That he could not say whether Pascual Ramos was wearing a shirt before his arrest by chief Quiñones and himself; that he had on a coat, trousers and undershirt; that at that moment he had no shirt on."

As may be seen, the defendant thought himself entitled to submit the testimony of policeman Barrios because he considered it a part of the *res gestae.* Evidently it was not. The statements made by the defendant to chief Quiñones and policeman Barrios were made a few hours after the occurrence, so that he had time to think it over, and at a different place and on a different occasion. Therefore, the court did not commit the error assigned.

The defendant could have insisted perhaps on submitting his statements through the testimony of Barrios and alleged that he did so in order to contradict the testimony of Quiñones, but he did not submit the question in that manner,

nor does it appear in any way that the testimony of Barrios had contradicted that of Quiñones.

Anyhow, it could not be considered that the refusal had been prejudicial to the defendant. The latter testified as we shall see later. The testimony of Quiñones will be transcribed after that of the defendant. We know the testimony of policeman Barrios. If we take them together we must conclude that the fact of the wound of the defendant had been corroborated by Quiñones as well as by Barrios and that the statements of the defendant as to how he had received that wound and that there had been a fight and that he had acted in his own defense and that that was what he said when he was arrested, are as a whole corroborated by chief Quiñones, and we are not going to imagine that Barrios could have said more than was said by the defendant himself. Such being the case, his testimony would have been merely cumulative.

The defendant testified:

"That his name is Pascual Ramos; that he is a resident of Guayama; that he knew Carlos Rossó; that about the 23rd of December of last year there had been something the matter between him and Carlos Rossó; that in the afternoon of the previous day there had been an argument between the defendant and Rossó; that the argument had been on account of the work; that the defendant had worked two nights before and on that night he had prejudiced the boss against him and that he had told him that it was he who was going to do the work himself or, if not, Andrés Delgado would do it in his place; that that very afternoon Carlos Rossó had told the defendant that he was going to put him out feet foremost and warned the defendant to leave the place; that the defendant had been told to quit; that the witness went on working during the nights of Sunday and Monday and that it was on Tuesday that he was dismissed from the factory; that it was on Tuesday night; that on the morning of the 23rd of December the defendant was on his way to see foreman Enrique Ortiz in search of work; that he met Manuel Vázquez; that he saw Carlos Rossó at dawn in the plantation Sabater; that later on about ten a. m. when the deed was committed Carlos Rossó was on the plantation Sabater; that what happened between

the witness and Carlos Rossó was that the witness arrived about ten a. m. where they were working and on trying to pick up a piece of board Rossó said to him: What are you looking for here? 'Get off immediately because you have been dismissed from here;' that the witness answered that he was going to see the boss and ask him for work; that then Rossó told him again to quit as he had been dismissed; that he grabbed his arm; that Rossó had a machete and when the witness picked up the piece of board Rossó said to him: 'you must leave this place now because you have been dismissed,' and he grabbed him in this way; that Rossó struck at him with a machete wounding him in the neck with the end of it, and on feeling wounded the witness struck at him with the flat of his machete but without meaning to wound him, but his machete twisted and he wounded him; that the witness went there to get some firewood.

"Cross-examined by attorney Anglade:—That the witness attacked him with his machete after he had been wounded; that Rossó went against the defendant who dodged him and it was after the witness had been wounded that he struck at him with the flat of his machete but without intending to wound him and the machete twisted and wounded him; that the struggle was short; that Cándido Ortiz was in the warehouse taking out lumber when the above took place; that Rosendo Moreno was leaning against a cart looking towards the warehouse where Cándido Ortiz was and it was after a while that he looked and Cándido Ortiz came out.

"Cross-examined by the District Attorney:—That the previous day he had had a few words with Carlos Rossó; that it was not three days before; that he worked for two days in the afternoon; that Rossó sent for him because he had been dismissed from work; that he had been dismissed by foreman Juan Sabater because Rossó had prejudiced the latter against him; that he was sure it was Rossó who had prejudiced him because he hated him; that there had been no argument on the next day; that it was on the day following the argument that the act had been committed; that Rossó struck at him with a machete; that the defendant then grabbed him with his left hand and struck at him with his right hand; that when he struck at Rossó the machete fell to the ground near him; that Rossó fell by the side of the cart at about three spans therefrom.

"Cross-examined by the jury:—That the wound of the defendant was on the right side; that Carlos Rossó struck at him with his right hand in this way because the witness was in this position; Rossó was on this side, immediately he struck at me and wounded me with

the point of the machete; that Rossó was near the defendant. The defense rested its case."

Chief Quiñones testified:

"That his name is Fernando Quiñones; that he is district chief in the police force; that on the 23rd of December of last year he was on duty in Guayama; that on that day he was informed that a crime had been committed in that district; that he went to the plantation Sabater of Guayama on account of some crime having been committed there; that he saw the dead body of a colored man with a wound in the neck; that there was there an oxcart and the man's legs were on the cart's pole and his head on the ground and underneath his legs and the pole there was a machete; that the machete shown him is the same that was between the pole and the dead man's legs; that later on about 2 p. m. the defendant was arrested within the jurisdiction of Arroyo, in the plantation Cora of Arroyo, when nearing the house of a sister of his; that the crime had been committed between 10 and 11 a. m. and the arrest took place about 2 p. m.; that when the defendant was arrested they took a machete which he had in his hand; that the machete taken from him is the same shown to him; that he told him that he had wounded Carlos Rossó with that machete. That he had made other statements; that such statements had been voluntarily made; that he was the while talking; that he was telling those things without being questioned; that he had not been threatened by him into making such statements; that the defendant had told that he was a watchman in the plantation Sabater in charge of some warehouses and that he had been dismissed on account of Rossó; that he had had an argument with Rossó and that Rossó had struck at him with a machete and had wounded him in the neck.

"Cross-examined by the defense:—That the defendant had confessed to him that there had been a quarrel between Rossó and the defendant; that he had not explained what kind of quarrel, but that the defendant had told him that there had been a quarrel and that Rossó had struck at him, wounding him in the neck (pointing at the right side of his neck) and that he then struck at him; that the defendant had a wound on the right side of his neck; that the witness had taken the defendant to the police station and then to the hospital; that the defendant had really confessed to him that there had been a quarrel between them and that Rossó had struck at him."

Since we have quoted from the defendant's evidence and

practically have transcribed the whole of it, it seems that it would be proper to quote from the evidence for the prosecution in order to have a full view of the case and better consider the other assignments of error.

This is a serious case, as the defendant was sentenced to death, although it is not a complicated case as regards the evidence.

The first witness for the Government was Dr. Bonelli, the surgeon who made the post-mortem examination on the body of Rossó. He testified that Rossó "was a man about seventy years of age, colored, with muscles fairly developed . . . . who showed as the only exterior lesion a wound caused by a sharp weapon in the middle cervical region from the back towards the front and extending from the posterior cervical muscles to the angle of the upper right jaw; that the dead man's head was left adhering to the body only by the muscles of the neck, and that that wound had severed transversely the spinal column and the spinal cord by the third cervical vertebrae; . . . . that death had been directly caused by the severing of the spinal cord and the great blood vessels; that such wound had been probably caused with a *machete;* that death had been instantaneous; . . . . that probably the victim was turning his back when he received the wound because if he had been struck from in front he would have been wounded on the right side in front; that he believed the wound had been inflicted from behind because of its direction and above all its extent."

Dr. Bonelli also testified that he had examined the defendant when the policeman took him to the hospital and that "he had a superficial wound in the skin of the neck about two inches long, . . . . that such wound had been caused by a short instrument because a *machete,* considering the size of its blade, would have inflicted a larger wound; that the wound could only have been inflicted with a *machete* in this way (holding the two ends of the *machete* with each hand); that in that way he might have scratched his skin with the

edge of the point of the *machete,* that the wound could not have been inflicted in a struggle, and that the witness was inclined to think that it had been inflicted with a short instrument.''

The foregoing answers were given to questions from the district attorney without any objection on the part of the defense. The latter, however, examined the witness extensively. The result thereof did not modify the direct examination.

After the doctor had testified witnesses Cándido Ortiz and Rosendo Moreno were called and testified as follows:

"Cándido Ortiz, examined by the District Attorney, testified under oath as follows:—That his name is Cándido Ortiz; that he lives in Guayama on Palma Street; that on December 23 of last year he was working in Sabater, a cane plantation in Guayama; that he worked as carpenter in fixing up carts for carrying cane; that he was helped by a workman called Carlos Rossó; that the machete shown to him is that of Carlos Rossó; that Carlos Rossó used it in sharpening the stakes; that after sharpening the stakes Carlos Rossó placed the machete on the ground; that he saw Pascual Ramos that day around the place moving about with a machete in his right hand; that Ramos did not speak to him or to Carlos Rossó; that Carlos Rossó was killed there; that he was killed by Pascual Ramos; that the witness had said to Carlos: 'what are we going to do now?', and Carlos Rossó said: 'let us take off the pole of the cart and put in a new one', and he said: 'all right, then lift up the pole a bit to remove the screw'; that Rossó stooped to lift up the pole and at the same time the defendant sprang up and cut his neck; that there had not been any words or struggle between them; that the witness was close to Carlos Rossó; that Carlos Rossó fell to the ground close to the pole he was holding, with his neck on the ground and his hands underneath without having uttered a word; that the defendant went away at once and that the witness did not see that he was wounded.

"Cross-examined by attorney Porrata:—That Carlos Rossó's watch used to be kept during the day from six to six; that he did not know which days of the week he was on duty; that he carried the machete when keeping watch; that he had known Carlos Rossó for twenty years; that he was not acquainted with Pascual Ramos; that he had seen Pascual Ramos; that Pascual Ramos was the night watch-

man and Carlos Rossó the day watchman; that the act was committed between 10 and 11 a. m.; that before the infliction of the wound Pascual Ramos walked about during forty minutes more or less, that he walked from right to left; that Carlos Rossó nor he spoke to him; that they had not got excited; that he had a machete in his right hand; that he did not make any gesture during those forty minutes; that the witness had not been disturbed by seeing Pascual Ramos walking about for forty minutes without saying a word; that it was not true that the witness was in the warehouse when the killing was done; that Pascual Ramos, the witness and Carlos Rossó were close; that the three were together; that the witness does not know whether there had been any quarrel between Pascual Ramos and Carlos Rossó on account of work; that he did not know whether the day before there had been a fight between Carlos Rossó and Pascual; that he was not informed of the doings on the plantation because the witness lived in town; that the three were alone; that there had been no struggle there between Pascual and Rossó.

"Rosendo Moreno, on examination by the District Attorney, testified under oath:—That his name is Rosendo Moreno; that he lives in Reunión; that on the 23rd of December of last year he was in Sabater, on the plantation Mercedes of Guayama; that he saw Cándido Ortiz, that he also saw Carlos Rossó; that Cándido Ortiz was placing a peg in the pole of a cart and Carlos Rossó was helping him; that he saw the defendant round about there; that he had a machete in his hand; that on Carlos Rossó's going to lift up the pole of the cart, Pascual Ramos came up and wounded him; that the wound was inflicted with that machete; that it was inflicted in this way (he stoops down); that after having inflicted the wound the defendant walked on; that Rossó said nothing when falling; that before the machete wound the witness saw the carpenter, Rossó and Pascual; that while he was there no provocation whatever took place; that neither was there any struggle; that that took place in the ward of Las Mareas on the plantation Mercedes of Guayama.

"Cross-examined by attorney Porrata for the defense:—That the witness was on the plantation Mercedes; that he was sitting on top of a cart; that on that day he was not working and went to see his sister in Sabater; that the witness lives in Reunión; that his sister was not sitting near the cart; that he sat on the cart for about fifteen minutes; that Pascual Ramos arrived after he had been there; that he arrived five or six minutes afterwards; that Pascual Ramos remained there shorter than he had; that Pascual said nothing until

he killed him; that Pascual came from the direction of the little houses; that Pascual had been standing for about six minutes before inflicting the machete wound; that he had been standing without moving before giving the machete wound; that Cándido Ortiz was the carpenter there; that Cándido was putting a pole to the cart; that Rossó was there helping the carpenter, sharpening some stakes; that he has known the defendant some eight or ten years; that there had been no quarrel between them while he was there on that day; that the defendant and Rossó were watchmen, one on duty during the day and the other during the night; that the defendant had been dismissed from the place; that before his dismissal he used to be on night duty.

"Cross-examined by the jury:—That there were only four persons there, Rossó, Cándido Ortiz, Pascual Ramos and the witness; that the witness was distant about the length of an ox-cart; that the carts were near to each other."

Only three more witnesses testified: Alfaro Saldaña, Fernando Quiñones and Andrea González.

We know the testimony of Quiñones. Saldaña testified that he heard it cried out the day of the occurrence that Rossó had been killed and that Ramos was the killer. The defense objected. The district attorney explained and no exception was taken. Saldaña also testified that he saw the defendant passing and said to him: "say, stop, what have you done," that "he did not answer anything; that Pascual went on his way; that his clothes were all right; that he did not see that he was wounded."

Andrea González was the last witness for the prosecution. We will transcribe in full her testimony with the incidents which took place in connection therewith.

"That her name is Andrea González; that on the 23rd of December of last year she was in her home on the plantation Sabater of Juana Díaz (it is Guayama); that she lives on the plantation Sabater and knows Pascual Ramos; that she saw him on that morning passing her house; that he was going rather fast and carried a machete in his hand; that she did not pay attention to the clothes of the defendant; that he was cleanly dressed.

"Attorney Porrata:—We will take exception to those questions because they do not form part of the *res gestae*.

"Judge:—The witness has testified that she saw Pascual Ramos in the morning of the 23rd of December of last year. She can answer.

"That Pascual Ramos passed in front of her home between 10 and 11 a. m.; that he was walking very fast; that he carried a machete in his hand; that she did not see that he was wounded; that as he was passing she heard the shouting.

"What was it you heard?—That Pascual Ramos had killed Apán (Carlos Rossó).—At this moment the defense intervenes.

"Attorney Porrata:—We object to her testifying as to what she heard said unless it be a *dying statement*.

"Judge:—The witness is not testifying that the defendant had killed another, but that she heard it said that somebody had been killed.

"The witness goes on testifying in answer to questions from the prosecution:—That she heard that said.

"Cross-examined by attorney Porrata:—That she was in her home; that she was not in her yard; that she was looking out of a window, just looking, and she used to do that at any time of the day; that she knows Pascual Ramos with whom she has exchanged some words; that she had not known him previously; that her conversations with Pascual Ramos were of the ordinary kind with any person when a few words are exchanged; that she was looking out of a window of the farthermost highest little house; that she does not know Alfaro Saldaña; that today is the first time she has seen him and when he went to the plantation to work for the first time; that the only person entitled to be in her home is her husband; that she did not see Alfaro Saldaña around there; that the defendant went up the narrow lane in front of her home; that he was coming towards Guayama; that her house is on the right hand side; that she did not talk with Pascual Ramos who was coming along striding; that if Pascual had been wounded in the other side she would have noticed it; that he was not because she had noticed his clothes; that she noticed him because he had never passed like that; that she did not notice whether he was wounded because the only thing he carried in his hand was a machete; that she is not a relative of the wife of Carlos Rossó; that they are intimate friends; that they are living together; that they are living about thirty-five yards apart."

Such was the evidence introduced and to which we shall refer again at the proper time.

Before the judgment was rendered the defendant raised, by a motion in arrest of judgment, the question as to whether the death penalty had not been abolished in Porto Rico. The court overruled the motion and its ruling is attacked as erroneous. After the decision of this court in the case of *People* v. *Arrocho,* 34 P.R.R. 809, and that of the Circuit Court of Appeals for the First Circuit on appeal in the case of Arrocho, and the dismissal by the Supreme Court of the United States of the petition in certiorari on appeal from the aforesaid judgment of the Circuit Court, we can say only that it is a settled question that the death penalty exists in Porto Rico.

Another assignment of error is the dismissal by the court of another motion by the defendant on the ground that "in the impanelling of the jury before whom the case was tried there had been a complete irregularity . . . . because without exhausting the ordinary panel and without an express order from the court directing the first and second extraordinary panels to be placed in the urn, the clerk of the court deposited therein the ordinary regular panel and the first and second extraordinary panels, and he proceeded to draw from the urn the names of the jurors before whom the defendant was tried."

The contention has no foundation. The motion was filed a few days after the trial. It appears from the statement of the case that the jury who acted in the case had been expressly accepted by the parties. Even in the absence of the above circumstances, the error assigned would not have been committed. A similar case was decided by this court against the contention of the appellant. We refer to the case of *People* v. *Juliá,* 25 P.R.R. 238, in which this court, by Mr. Justice Wolf, said:

"The regular jurors of the first panel were in attendance, but a number of them had been challenged by reason of their having taken

part in a similar prosecution. The court ordered another panel of twenty-four to be summoned and combined these with the eligible men of the first panel, so that there were more than thirty jurors in attendance. *Held:* That this was not a violation of section 199 of the Code of Criminal Procedure, which limits the number of jurors to twenty-four, because the court has ample discretion under section 202 of the said code and the doctrine is well established that a greater number of jurors cannot prejudice the defendant; that similar statutes are merely directory, and that the courts will not reverse in the absence of a showing of prejudice.''

The same question regarding the death penalty was raised in this assignment. There was filed ''a motion to quash'' on the ground of the non-existence of the death penalty, which was properly overruled.

The appellant alleges that the court erred in refusing a new trial.

We have examined the motion carefully, which contains several allegations, some of which have already been considered in this opinion. We shall confine ourselves to a consideration of those which have not been studied.

It is alleged that though no objection was taken to the testimony of Dr. Bonelli, that testimony was inadmissible and should not have been admitted by the court, quoting several authorities which hold that the opinions of doctors regarding the relative position of the parties at the moment of the assault, or wounds, or shots, are not admissible.

The objection and the exception were necessary. Besides, though it can not be denied that Dr. Bonelli testified in that way, the two only ocular witnesses of the act place the parties in the same position. There was no prejudice. For a wider consideration of this point see *People* v. *Collazo*, 33 P.R.R. 48.

The appellant also complains of the fact that witness Andrea González was allowed to testify in the way she did.

In our opinion her testimony was permissible, but even if it were not so, no proper objection was made thereto nor can it be considered as prejudicial.

Newly discovered evidence was alleged and there were presented in effect several affidavits from persons who were willing to testify. We have examined them and they all state that Ramos and Rossó were watchmen in the factory Molinaris, the former keeping watch at night and the latter during the day; that there had been quarrels between them; that one day at dawn they saw Ramos going into a house where there was a wake, leaving his lantern outside, and that Rossó carried it away; that Rossó commissioned Andrés Delgado to call Ramos and when both appeared Rossó told Ramos to turn over the watch to Delgado, and that José Colón had maintained in the presence of Rossó that the latter had stolen the lantern from Ramos.

None of the evidence introduced as newly discovered refers to the way the act was committed, but to the motives therefor. The defendant admits having killed Rossó. Such newly discovered evidence would have been adverse rather than favorable, as it tends to show that the offended person had been Ramos and not Rossó, since it was Ramos who had been dismissed from work on account of Rossó's having prejudiced his boss against him.

It is alleged that the verdict is contrary to the evidence. If the jury believed, as evidently they did, the testimony of the two only ocular witnesses which we already know, one can not imagine evidence more clear and consistent with the information.

Ramos was near Rossó armed with a *machete;* Rossó was working and on stooping down and turning his back to Ramos, the latter sprang up and gave him such a wound with his *machete* that he severed his spinal column, his head remaining adhering to the body by the muscles only, the wound causing his death instantaneously.

The testimony of the two ocular witnesses has been contradicted only by that of the defendant and by the wound that the latter showed in his neck on being arrested.

The jury adjusted the conflict and there is nothing that

could make us come to the conclusion that they did not act in accordance with law and justice. On the contrary, a conscientious analysis of the defendant's own testimony brings us to the conclusion that they acted properly. The defendant himself might have inflicted the superficial wound which he showed, as a ground for his defense. The testimony of Alfaro Saldaña and that of Andrea González support that of the ocular witnesses regarding the fact that Ramos had not been wounded by Rossó.

The motion for a new trial was properly overruled.

We shall proceed now to the consideration of the last assignment of error which refers to the instructions from the court to the jury.

It is alleged that such instructions were erroneous and contradictory in so far as they attempted a definition of murder in the first degree and murder in the second degree, necessarily bringing confusion to the mind of the jurors.

It is also alleged that the following instruction is quite erroneous:

"The defendant may or may not testify, according to the express provision of the law, and the fact that the defendant does not testify (in the present case the defendant has not testified) does not tell against him; it neither prejudices nor favors the defendant."

After giving the instructions the judge addressed himself to the attorneys for the defense and to the district attorney and asked them whether they wanted to submit any further instructions, and they answered in the negative. No exception was taken. The instructions, taken as a whole, give the impression of having been as wide and just as required by law. They first refer to the information; then to the evidence, of which an impartial summing up is made including the testimony of the defendant. The defense alleged by the defendant is very clearly established and the definition is taken up of the two degrees of murder, of manslaughter, of one's own defense, of reasonable doubt, etc., etc., and winds up thus:

"If as a result of the evidence introduced you have come to the conclusion that defendant Pascual Ramos, wilfully and illegally, deliberately and with malice aforethought, killed Carlos Rossó on the day mentioned in the information, namely the 23rd of December, 1925, then it shall be your duty to convict this defendant of murder in the first degree.

"Likewise if as a result of that same evidence you believe that Pascual Ramos killed Carlos Rossó in an illegal and wilful manner, with malice aforethought but not deliberately, then it shall be your duty to convict this defendant of murder in the second degree.

"If as a result of that same evidence you believe that this defendant Pascual Ramos did not commit the deed with which he has been charged by the district attorney in the information, then it shall be your duty to acquit this defendant.

"It shall also be your duty to acquit this defendant if, as a result of the evidence introduced, you entertain a doubt as to his guilt, the reasonable doubt of which I have already spoken to you, giving him the benefit of such doubt and acquitting him.

"Likewise, gentlemen of the jury, if as a result of the evidence you believe that defendant Pascual Ramos killed Carlos Rossó in his own defense, either because he believed that he was in immediate and imminent danger of death, or that he believed himself to be exposed to suffer serious bodily injury, then it shall also be your duty to find him not guilty."

It is true that some faults and contradictions are to be found in the statements of the judge relative to murder in the first and second degrees, to express malice and to tacit malice; but we firmly believe that they did not impress the jury and that the final part which is correct cured any technical defect that previously might have been incurred.

Our greatest doubt has been about the instruction in regard to the testimony of the defendant. It seems that the judge had prepared beforehand the usual instructions common to all cases and read the one relating to the right of the defendant to testify or not. He remembered after having started that the defendant had testified and, instead of eliminating as unnecessary such instruction, went on reading, confining himself to interpolate the fact of the testimony of the defendant.

What influence could that attitude of the judge have had on the verdict of the jury?

It is sought to allege that the last words of the instructions "it neither prejudices nor favors the defendant" refer to the testimony given by him.

It is impossible to accept that interpretation, but really if the judge had read an unnecessary instruction, he should have amended it by saying that where the defendant testifies, the jury should consider his testimony the same as that of any other witness, the jury of course being then at liberty when weighing it to take into account the natural interest of the defendant in his own case.

Were it not that it can be inferred from the context of the instructions that the judge referred to the testimony of the defendant exactly in the same way as to the rest of the evidence, we would consider this error as of the greatest importance and bearing on the resolution of the case.

For the foregoing reasons the judgment appealed from must be affirmed.